ROBERTS, J.,
for the Court:
¶ 1. Stephanie Roberts appeals the Claiborne County Chancery Court’s decision that her ex-husband, Scott Roberts, was not in contempt for failing to pay child support according to the agreement they had entered incident to their divorce. Stephanie also appeals the chancellor’s decision to deny her request for attorneys’ fees. According to Stephanie, the chancellor also erred when he awarded her half of the child support that Scott had agreed to pay her, despite the fact that Stephanie and Scott had agreed that their thirteen-year-old son, Tristan, could live primarily with Scott during the school year while their daughter, Carleigh, would remain primarily with Stephanie. Additionally, Stephanie claims the chancellor erred when he modified Scott’s child-support obligation. Finally, Stephanie argues that the chancellor incorrectly modified her and Scott’s original agreement and awarded Scott primary physical custody of Tristan.
¶ 2. We find that the chancellor correctly held that Scott owed Stephanie $2,700 in unpaid child support rather than $5,400. We also find that the chancellor did not abuse his discretion when he modified child custody so that neither Scott nor Stephanie was obligated to pay child support. However, the chancellor erred when he did not find Scott in contempt, declined to award Stephanie attorneys’ fees related to proving that Scott was in contempt, and modified child custody without first finding that there had been a material change in circumstances that was adverse to Tristan’s best interest. Consequently, we affirm the chancellor’s judgment in part, reverse and render in part, and remand for further proceedings consistent with our instructions below.
FACTS AND PROCEDURAL HISTORY
¶ 3. Scott and Stephanie Roberts were married in May 1992. They had three children. However, in March 2010, they divorced based on their irreconcilable dif *824 ferences. Scott and Stephanie obtained a draft of a property-settlement and child-custody agreement off of the internet and attempted to tailor it to suit their needs. Although their agreement says otherwise, neither Scott nor Stephanie consulted with an attorney before they executed it.
¶ 4. The agreement states that Scott and Stephanie would have joint physical custody of their two minor children, Carleigh and Tristan.[1] Even so, some of the terms of the agreement operated as though Stephanie had primary physical custody of the children. For example, the agreement provided that during the school year, Scott would only have Carleigh and Tristan every other weekend and one night each week.[2] But the agreement does not describe Scott’s time with the children as visitation. Scott also agreed to pay Stephanie $150 per week in child support.
¶ 5. In any event, Tristan approached Scott during July 2010 and said he wanted to try to live primarily with Scott during the school year. Scott relayed Tristan’s request to Stephanie and Stephanie consented. However, Stephanie later testified that Tristan still stayed with her during an uncertain number of school nights. Car-leigh continued living primarily with Stephanie. Carleigh and Tristan continued to alternate weekends between Scott and Stephanie. Although they alternated weekends, Carleigh and Tristan were together each weekend regardless whether they were with Scott or Stephanie.
¶ 6. Scott stopped paying Stephanie child support soon after Tristan began to live primarily with him. Despite Stephanie’s willingness to accept one-half of the child support contemplated by the agreement, Scott reasoned that he should not have to pay her child support because Tristan was living primarily with him and Carleigh was living primarily with Stephanie. In May 2011, Stephanie sued Scott and claimed he was in contempt of their original judgment of divorce because he owed her $5,400 in unpaid child support. Scott denied that he was in contempt and filed a “counter[-]motion to modify.”
¶ 7. After hearing Stephanie’s claim and Scott’s counterclaim, the chancellor found that Scott and Stephanie had entered an extra-judicial agreement to modify custody of Tristan. The chancellor declined to find Scott in contempt, but the chancellor also held that Scott owed Stephanie $2,700 in unpaid child support, which was one-half of the amount that Stephanie sought. The chancellor reasoned that Scott only owed half of the unpaid child support because Stephanie had agreed to accept one-half of the contemplated figure after Tristan began to live primarily with Scott.
¶ 8. Additionally, the chancellor granted Scott’s request to modify custody of Tristan. The chancellor also modified child support for both children so that neither Stephanie nor Scott was obligated to pay child support. Stephanie appeals.
STANDARD OF REVIEW
¶ 9. This Court will not disturb the findings of a chancellor unless the chancellor abused his discretion, erroneously applied the law, or committed a manifest error. Sullivan v. Sullivan, 942 So.2d 305, 306 (¶5) (Miss.Ct.App.2006). We will affirm the chancellor’s findings if there is substantial evidence to support them. Id. However, we review questions of law de novo. Id.
*825 ¶ 10. Scott did not file a brief. That does not mean that we are required to automatically reverse the chancellor’s judgment. N.E. v. L.H., 761 So.2d 956, 962 (¶ 14) (Miss.Ct.App.2000) (citing Selman v. Selman, 722 So.2d 547, 551 (¶ 13) (Miss.1998)). “[W]hen matters on appeal touch the welfare of a minor child, then regardless of whether a party filed a brief, this Court will reach the merits of the issues in this appeal, though we proceed unaided by a brief from the appellee.” Id. (citations and internal quotation omitted). Otherwise, we generally have two options that hinge on the state of the record and the quality of the appellant’s brief.
¶ 11. If the record is large or complicated and Stephanie “thoroughly briefed” the issues, provided “applicable eitation[s] of authority,” and presented an “apparent case of error,” then we should consider Scott’s failure to file a brief as his confession of error and reverse the chancellor’s judgment. Sullivan, 942 So.2d at 307 (¶ 7). But if “the record can be conveniently examined,” and the record “reveals a sound and unmistakable basis or ground upon which the judgment may be safely affirmed,” then we should disregard the fact that Scott failed to file a brief. Id. (quotation marks omitted).
ANALYSIS
I. CHILD-SUPPORT ARREARAGE
¶ 12. Stephanie claims the chancellor erred when he held that Scott owed her $2,700 in unpaid child support. Stephanie argues that the chancellor should have awarded her $5,400. The chancellor’s calculation was based on the concept that Scott owed Stephanie thirty-six child-support payments of $75. Stephanie notes that Scott voluntarily agreed to pay her $150 per week in child support even though it was possible that Tristan might choose to spend a majority of his time with Scott. Stephanie also claims Scott should not have been relieved of his contractual obligation to pay her $150 per week in child support, because Scott had agreed to pay that figure so that he could expedite their divorce, thereby making it possible for Scott to move in with his girlfriend.
¶ 13. “Courts award child support to the custodial parent for the benefit and protection of the child.” Smith v. Smith, 20 So.3d 670, 674 (¶ 13) (Miss.2009). “Such benefits belong to the child, and the custodial parent has a fiduciary duty to hold them for the use of the child.” Id. “[C]ourt-ordered child-support payments vest in the child as they accrue[,] and [they] may not thereafter be modified or forgiven, only paid.” Id. “But this does not mean that equity may not at times suggest ex post facto approval of extrajudicial adjustments in the manner and form in which support payments have been made.” Id. “The noncustodial parent may be entitled to credit for any additional support which he/she has evinced by satisfactory proof to the trial court.” Id.
¶ 14. In Varner v. Varner, 588 So.2d 428, 434 (Miss.1991), the Mississippi Supreme Court instructed:
Without doubt or hesitation, we encourage post-divorce detente that parents may cooperate in rearing their children. It follows that, from time to time, adjustments can and should be made without burdening the courts. The law remains firm that court-ordered child[-]support payments vest in the child as they accrue and may not thereafter be modified or forgiven, only paid. But this does not mean that equity may not at times suggest ex post facto approval of extra-judicial adjustments in the manner and form in which support payments have been made.
*826 (Internal citation omitted). In Bryant v. Bryant, 924 So.2d 627, 630-31 (¶¶ 9-10) (Miss.Ct.App.2006), this Court affirmed a chancellor’s decision that an extra-judicial agreement merited modification of a parent’s child-support obligation where the parents agreed that the father would not have to pay child support for two children who moved in with him after the original divorce judgment.
¶ 15. We find that the chancellor did not abuse his discretion. Stephanie does not claim that the chancellor erred by finding that she and Scott had reached an extra-judicial agreement regarding child support. Stephanie testified that she told Scott, “As far as the [agreement] says[,] you still owe me the full amount [of child support,] but since you have Tristan and I have Carleigh[,] then I’ll take the $75.” Stephanie further testified that she agreed to accept $75 per week in child support “[t]o try to be fair.” It was within the chancellor’s discretion to find that Stephanie had agreed to accept one-half of the child support contemplated by the agreement. Consequently, we find no merit to Stephanie’s claim that the chancellor erred when he ordered Scott to pay Stephanie $2,700 in unpaid child support instead of the $5,400 that Stephanie requested.
II. CONTEMPT
¶ 16. The chancellor found that Scott was “technically” in contempt of the child-support provisions of the agreement. However, the chancellor declined to find that Scott was in contempt because, according to the chancellor, Scott’s decision to withhold child support was based on his “good[-]faith misunderstanding of Mississippi law.” The chancellor also declined to find Scott in contempt because Scott was unable to fulfill his child-support obligation due to financial difficulty. Stephanie claims the chancellor erred. We agree.
¶ 17. “In a contempt action concerning past-due child support, when the custodial parent introduces evidence that the noncustodial parent who is required to pay the support has failed to do so, a prima facie case of contempt has been made.” Smith, 20 So.3d at 674 (¶ 14). The burden then shifts to the defending party, who may avoid being found in contempt by demonstrating by clear and convincing evidence that there was payment or some other defense. Id. at 674-75 (¶ 14).
Clear and convincing evidence is ... that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact[-]finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.
Moran v. Fairley, 919 So.2d 969, 975 (¶ 24) (Miss.Ct.App.2005). “Clear and convincing evidence is such a high standard that even the overwhelming weight of the evidence does not rise to the same level.” Id. “To rebut a prima facie case of contempt, a defendant must show an inability to pay, that the default was not willful, that the provision violated was ambiguous, or that performance was impossible.” Evans v. Evans, 75 So.3d 1083, 1087 (¶ 14) (Miss.Ct.App.2011) (citation and internal quotation omitted).
¶ 18. Stephanie proved that Scott was required to pay child support and that he had failed to do so. Accordingly, Scott bore the burden of proving, by clear and convincing evidence, that he was not in contempt. Scott did not claim the child-support provision was ambiguous or that it was impossible for him to perform his obligation to pay child support. Furthermore, Scott intentionally chose not to pay *827 any child support to Stephanie because Tristan was living primarily with him and Carleigh was living primarily with Stephanie. It follows that Scott’s only avenue to avoid contempt was to claim that he was unable to pay child support.
¶ 19. As Stephanie notes, there was evidence that Scott went on five or more trips to Lake Washington near Greenville, Mississippi. Scott paid for his own travel expenses, and he bought his own beer when he went on those trips. Scott also traveled to Oklahoma for his girlfriend’s niece’s wedding. Again, Scott paid for the gas so that he and his girlfriend could travel to Oklahoma. Scott also testified that he won a trip to Orlando, Florida. But Scott testified that he paid $200 in gas to travel to Orlando. He also paid $80 to visit Universal Studios while he stayed in Orlando. According to Scott, although he had not planned to meet his live-in girlfriend in Orlando, she just happened to be there. Scott testified that he paid for her food while they were both in Orlando. Scott conceded that he could have used the money he spent on trips to catch up on his child-support obligation.
¶ 20. At the time Scott and Stephanie divorced, Scott had been earning approximately $1,000 per week. He testified that he quit working as a self-employed construction framer in August or September 2010 because of “the economy.” He then began working for DirecTV. Scott did not testify that he was out of work for an extended period. He worked for DirecTV for “about three or four months,” and he earned twelve dollars an hour. Scott quit working for DirecTV because he was expected to work at night during a storm, and he “wasn’t making enough money for the time that [he] didn’t get to spend with [Carleigh and Tristan] because [he] had to work every weekend.” After Scott quit his job with DirecTV, he was out of work for approximately a month. He then began working for a construction company. Scott earned between fifteen and eighteen dollars an hour. Scott quit that job and began remodeling apartments for his father, who is the superintendent of the apartment complex. Scott testified that as of the time of the hearing, his “take-home” pay was between $700 and $1,000 per week.
¶21. There was some evidence that Scott had experienced financial difficulty. Scott testified that his four-wheeler had been repossessed. Scott also testified that he had to borrow $3,500 against a vehicle to pay for the children’s Christmas presents. Upon further examination, Scott testified that $1,100 of the money he borrowed went to vehicle payments. He also paid $1,000 toward his rent, despite his earlier testimony that his rent obligation was $425 per month since he and his live-in girlfriend each paid one-half of their rent and the utilities. Scott further testified that he spend $50 of the borrowed money on his girlfriend’s Christmas present. Scott could not remember how much of the remaining $1,350 actually went toward the children’s Christmas presents.
¶ 22. All things considered, we do not find substantial evidence that Scott sufficiently rebutted Stephanie’s prima facie case that he was in contempt. Scott was obligated to present prima facie evidence that he was unable to pay Stephanie $75 per week in child support. There was evidence that Scott could afford to take multiple trips, including trips to Oklahoma and Florida. And although there was evidence that Scott had changed employment, there was no evidence that Scott’s earnings had significantly changed since he and Stephanie divorced. Suffice it to say, Scott failed to present clear and convincing evidence that he could not have satisfied his obligation to pay Stephanie $75 per *828 week in child support. It follows that we find the chancellor erred when he declined to find Scott in contempt. Consequently, we reverse the chancellor’s judgment in part and render judgment for Stephanie as to this issue.
III. ATTORNEYS’FEES
¶ 23. Stephanie claims the chancellor erred when he did not order Scott to pay her attorneys’ fees. We agree. “When a party is held in contempt for violating a valid judgment of the court, attorney[s’] fees should be awarded to the party that has been forced to seek the court’s enforcement of its own judgment.” Gregory v. Gregory, 881 So.2d 840, 846 (¶ 28) (Miss.Ct.App.2003). When a party has been held in contempt, attorneys’ fees “may be properly assessed against the offending party without regard to the recipient’s inability to pay.” Evans, 75 So.3d at 1089 n. 8. “Fees awarded on this basis, though, should not exceed the expense incurred as a result of the contemptuous conduct.” Id.
¶ 24. Because we have found that the chancellor erred when he declined to find Scott in contempt, we reverse the chancellor’s decision that Scott was not obligated to pay Stephanie’s attorneys’ fees. However, we are unable to determine what portion of those fees were specifically related to proving that Scott was in contempt due to his failure to pay child support. Accordingly, we must remand this matter to the chancery court for further proceedings to determine that figure. Additionally, “[t]his Court has generally awarded attorneyfs’] fees on appeal in the amount of one-half of what was awarded in the [trial] court.” Makamson v. Makamson, 928 So.2d 218, 222 (¶ 18) (Miss.Ct.App.2006). Once the chancellor determines the appropriate amount of Stephanie’s attorneys’ fees that were attributable to proving that Scott was in contempt due to his failure to pay child support, the chancellor is directed to add an additional fifty percent in attorneys’ fees related to this appeal.
IV. MODIFICATION OF CHILD SUPPORT
¶ 25. Next, Stephanie claims the chancellor erred when he modified child support so that Scott was no longer obligated to pay her any child support. Stephanie specifically claims the chancellor should not have modified child support while Scott had “unclean hands.” “The clean[-]hands doctrine prevents a complaining party from obtaining equitable relief in court when he is guilty of willful misconduct in the transaction at issue.” Bailey v. Bailey, 724 So.2d 335, 337 (¶ 6) (Miss.1998) (citing Calcote v. Calcote, 583 So.2d 197, 199-200 (Miss.1991)). The supreme court has instructed:
A husband may not petition for modification of the original decree without showing either that he has performed it or that his performance has been wholly impossible. However, a husband may exonerate himself from failure to make alimony or child[-]support payments as ordered, because of his inability to pay, but his evidence must be made with particularity and not in general terms.
Id. (quoting Hooker v. Hooker, 205 So.2d 276, 278 (Miss.1967)). In Bailey, an ex-wife had missed two child-support payments when she moved to modify child support. Id. The supreme court found the chancellor erred when he modified the ex-wife’s child support, because she had presented no specific evidence of her inability to pay other than her own decision to quit earning a living. Id. The supreme court held that the chancellor erred by modifying child support while the ex-wife was in arrears. Id.
*829 ¶26. However, a judgment for the amount of an arrearage operates to “clean” the hands a party who would have otherwise had unclean hands for failure to pay that arrearage. Andres v. Andres, 22 So.3d 314, 320 (¶¶ 27-28) (Miss.Ct.App.2009) (citations omitted). The chancellor held that Scott and Stephanie had an extra-judicial agreement that Scott could pay Stephanie $75 per week in child support for Carleigh. The chancellor held that Scott owed Stephanie $2,700 in unpaid child support. That judgment effectively “cleaned” Scott’s hands. It follows that the chancellor did not err when he modified Scott’s child-support obligation and rejected the concept that Scott had unclean hands. Furthermore, Scott and Stephanie agreed that Tristan could live primarily with Scott, and Carleigh would continue to live primarily with Stephanie. Because each parent had primary physical custody of one child, we do not find that the chancellor abused his discretion when he held that neither Scott nor Stephanie was obligated to pay child support. We find no merit to this issue.
V. MODIFICATION OF CHILD CUSTODY
¶ 27. Finally, Stephanie claims the chancellor erred when he modified custody of Tristan and awarded Scott primary physical custody. According to Stephanie, Scott did not adequately plead for a modification of child custody. Stephanie also claims the chancellor erred when he modified custody of Tristan without first finding that there had been a material change in circumstances that was adverse to Tristan since the original divorce judgment.
¶ 28. First, we find that Scott’s “counter[-]motion to modify” was sufficient to request a modification of child custody. Scott’s “counter[-]motion to modify” could be considered somewhat ambiguous in that it does not directly request that the chancellor modify custody of Tristan. However, Scott requested that the chancellor modify Scott’s child-support obligation. Scott also stated that “hereafter, each party should be responsible for child support of the child in their respective custody with neither party responsible for future support of the other.” Scott’s “counter[-]motion” also stated that because Tristan had moved in with Scott on a full-time basis, there had been a material change in circumstances that warranted modification of the final judgment of divorce, so neither Scott nor Stephanie should be obligated to pay child support.
¶ 29. “All pleadings shall be so construed as to do substantial justice.” M.R.C.P. 8(f). “The rule allows the claims to be stated in general terms so that the rights of the client are not lost by poor drafting skills of counsel.” M.R.C.P. 8 cmt. We find that Scott’s “counter[-]motion to modify” adequately requested that the chancellor modify custody of Tristan. To find otherwise would be the equivalent of favoring form over substance.
¶ 30. Next, Stephanie claims the chancellor erred by modifying custody of Tristan without first finding that there had been a material change in circumstances adverse to Tristan’s best interest. “The Mississippi Supreme Court [has] held that the prerequisites to the modification of child custody are: (1) proving a material change in circumstances which adversely affects the welfare of the child and (2) finding that the best interest of the child requires the change of custody.” McMurry v. Sadler, 846 So.2d 240, 243 (¶ 13) (Miss.Ct.App.2002) (citing Touchstone v. Touchstone, 682 So.2d 374, 377 (Miss.1996)). “[F]or the custody order to be modified so as to transfer custody to the non-custodial parent, the non-eustodial parent must prove that since the entry of *830 the decree or order sought to be modified, a material change of circumstances has occurred within the custodial home which adversely affects the minor child’s welfare.” Id. at 244 (¶ 13). “Therefore, in order for the court to proceed on a matter for custody modification, the pleadings must contain allegations that a material change has occurred which adversely affects the child.” Id. It is inappropriate to modify child custody when the non-custodial parent did not file a motion that specifically stated or alleged that there had been a material change in circumstances that adversely affected a child. Id. at (¶ 14).
¶ 31. Scott did not claim that there had been a material change in circumstances or that such a change was adverse to Tristan. Furthermore, the chancellor merely held that there had been a material change in circumstances. The chancellor did not find that a material change in circumstances was adverse to Tristan. Furthermore, the chancellor did not conduct an Albright analysis to determine which parent should have custody of Tristan.
This Court has held that when considering a modification of child custody, the proper approach is to first identify the specific change in circumstances, and then analyze and apply the Albright factors in light of that change. Where there is no specific identification of the alleged change in circumstances, this Court is placed in the position of attempting to guess what the chancellor determined was a proper basis for a change in custody.
Thornell v. Thornell, 860 So.2d 1241, 1243 (¶ 6) (Miss.Ct.App.2003) (quoting Sturgis v. Sturgis, 792 So.2d 1020, 1025 (¶19) (Miss.Ct.App.2001)) (quotation marks omitted). Here, we can only guess why the chancellor found that a material change in circumstances was adverse to Tristan’s best interest. Furthermore, the chancellor did not conduct an Albright analysis before he found that it was appropriate to award custody of Tristan to Scott. In Thornell, 860 So.2d at 1243 (¶¶7-8), this Court reversed a chancellor’s decision to modify child custody, because the chancellor failed to identify a specific change in circumstances that adversely affected the welfare of the child, and the chancellor failed to conduct an on-the-record analysis of the Albright factors. This Court concluded that it was appropriate to reverse the chancellor’s judgment and remand the matter to the chancellor for further proceedings. Id. at (¶¶ 8-9). Following Thomell, we remand this matter to the chancellor for further proceedings regarding how Tristan’s decision to live primarily with Scott amounted to a material change in circumstances adverse to Tristan’s best interest in light of the fact that Scott and Stephanie agreed that they would have joint physical custody of Tristan and Car-leigh.
¶ 32. THE JUDGMENT OF THE CLAIBORNE COUNTY CHANCERY COURT IS AFFIRMED IN PART, REVERSED AND RENDERED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE PARTIES.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, MAXWELL AND FAIR, JJ., CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. JAMES, J., NOT PARTICIPATING.

. Scott and Stephanie’s oldest child was not a minor when Scott and Stephanie divorced. Carleigh was fifteen years old. Tristan was thirteen years old.

. The agreement provided that the children would spend equal time with Scott and Stephanie during the spring, fall, Christmas, and summer breaks from school.