# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00923-COA

**ISRAEL BRIGGS**                                                    **APPELLANT**

v.

**ROSETTA WEARY**                                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/11/2023 |
| TRIAL JUDGE: | HON. MARK ANTHONY MAPLES |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | SAMUEL CHRISTOPHER FARRIS |
| ATTORNEY FOR APPELLEE: | ROSETTA WEARY (PRO SE) |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND REMANDED - 11/26/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., McDONALD AND EMFINGER, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Israel Briggs appeals from a Jackson County Chancery Court judgment granting Rosetta Weary's petition to modify the parties' prior agreed judgment concerning support, custody, and visitation for their child, M.C.B.[1]  On appeal, Israel argues that the chancery court erred in failing to find a material change in circumstances adversely affecting the child before changing their custody agreement and failing to apply the *Albright* factors[2] when granting Rosetta sole custody of the child.  Israel further contends that the court erred in its

---

[1]  For privacy reasons, the child is referred to by initials only.

[2]  In *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983), the Mississippi Supreme Court set out a number of factors the chancery court may consider in determining in which parent's custody the child's best interest would be served.

calculation of child support and by enjoining Israel from installing surveillance equipment in his home. Rosetta did not file a brief on appeal. Based on our review of the record and relevant precedent, we reverse the chancery court's judgment and remand.

**Facts**

¶2. Israel, a cybersecurity analyst and officer in the United States Air Force, and Rosetta, a substitute teacher, began a romantic relationship in 2007. They had one child, M.C.B., in 2008. Later, Israel said that Rosetta told him that M.C.B. was not his child. He took an independent DNA test and filed an action in chancery court to establish his paternity when Rosetta took him off the child's sign-out list for daycare. In a temporary order entered in October 2008, the chancery court awarded temporary custody to Israel and ordered Rosetta to pay child support.

¶3. On February 20, 2009, the chancery court entered an agreed judgment resolving the paternity dispute, adjudicating Israel as M.C.B.'s natural father. This judgment included provisions for joint physical and legal custody of the child. Neither party was ordered to pay child support because both parents maintained a "duplicate primary residence" for the child. However, Rosetta was ordered to remit backpay for child support she owed under the temporary order.

¶4. The judgment further set out a weekly schedule for exchanges of the child. Israel would have M.C.B. for three consecutive nights, and Rosetta would then have the child for a period of eight consecutive nights. Israel would then get the child for another three nights.

2

Every four weeks, the parties would switch periods. Under this arrangement, each party would have physical custody of the child for about half of each month. The order also included "Supplemental Considerations," including a provision that prohibited either party from entertaining overnight guests of the opposite sex, unless related by blood or marriage, while exercising any custodial period with the minor child. In addition, the parties alternated years in which each parent could claim the child as a dependent for tax purposes. There was also a provision requiring Israel to pay for the child's college expenses.

¶5.     After entry of the 2009 agreed judgment, Israel and Rosetta continued to engage in an on-again-off-again relationship until 2018, when Israel began dating someone else. During the course of their relationship, Israel fathered two other children. Israel and Rosetta continued to litigate custody and visitation of M.C.B. before the trial court. These matters included an emergency request for modification, a motion for unsupervised temporary visitation, and an agreed order granting an oral motion for the appointment of a guardian ad litem.

¶6.     In November 2019, Israel filed a petition to hold Rosetta in contempt for denying him his custodial time with M.C.B. A temporary order was entered that replaced the prior custodial provisions in the 2009 judgment. However, on March 18, 2020, the chancellor recused himself, and Israel voluntarily dismissed his contempt petition with prejudice on

3

March 23, 2020, causing the 2009 agreed judgment to resume its force and effect.[3]

*Petition for Modification of Custody*

¶7. On November 19, 2020, Rosetta filed a petition for modification of custody, alleging that Israel's "current romantic relationships and living arrangement" constituted a material change in circumstances negatively affecting the child because M.C.B. was "very uncomfortable" with Israel's dating two women. Rosetta pleaded that it would be in the child's best interest if she (Rosetta) were granted full custody. Rosetta also pleaded that Israel "belittles" M.C.B. and "is very controlling" of her, which caused the child to suffer mentally and emotionally. Rosetta also contended that M.C.B. was having a difficult time with the current visitation/custody schedule, and Rosetta requested sole custody of the child.

*Motion to Dismiss*

¶8. On January 4, 2021, Israel filed a motion to dismiss Rosetta's petition pursuant to Rule 12(b)(6) of the Mississippi Rules of Civil Procedure. Israel argued that no material change of circumstances had occurred that adversely affected M.C.B. and that there was no evidence to support Rosetta's claims. Israel claimed that the evidence Rosetta relied on

---

[3] During this time, because Israel missed five months of custody with M.C.B., who was then twelve years old, the parties began reunification therapy with Dr. Beth Casey. Dr. Casey held a joint session in December 2020 with all of them. There, it was revealed that M.C.B. had secretly recorded conversations between her and her grandmother and sent them to her mother. Israel was also concerned that M.C.B. had recorded a disagreement he had with the mother of his other children. M.C.B.'s therapy sessions began in an attempt to reunify her with Israel. The record shows that Dr. Casey held several sessions with each parent individually or, sometimes, with both parents.

4

concerning Israel's relationships with other women was "nothing more than vague allegations, labels, hearsay, conclusory statements and other averments made in bad faith." Israel also argued that any claim of emotional abuse was baseless.

*Guardian Ad Litem's Report Regarding Child's Mental Health*

¶9. While the petition for modification was pending, Kelly Hunter was appointed guardian ad litem (GAL) for the child in July 2021, and she ultimately submitted a report on her interactions with the child and the parents. Hunter reviewed the child's mental health and medical history. In April 2021, M.C.B. was treated for anxiety issues by a nurse practitioner, Ramona Gurley, who prescribed Prozac. Israel didn't agree and wanted a second opinion. M.C.B. was then seen at Southern Psychology in Mobile, which gave the same diagnosis and recommendations.[4] In May 2021, M.C.B. was also prescribed Vitamin D supplements based upon her blood test results. According to the GAL report, M.C.B. went on vacation to Hawaii with Israel and his girlfriend. M.C.B. did not take her medication with her. Israel did not know, and Rosetta did not advise him, that M.C.B. had been taking medication for anxiety. After they returned from Hawaii, Israel and Rosetta also discovered that M.C.B. was self-harming.

¶10. On July 5, 2021, M.C.B. was admitted to Gulfport Behavioral Health (GBH) as a result of her self-harming. She was diagnosed with a "major depressive order, severe, with psychotic elements" and discharged to Rosetta's care with prescriptions for Abilify and

---

[4] It was unclear whether Israel knew of the second opinion.

Prozac.[5] At that time, the guardian ad litem recommended a modified schedule that limited Israel's custody of M.C.B. with the understanding that his custodial periods would gradually increase. The parties agreed.

¶11. Hunter found M.C.B. to be articulate, intelligent, and excellent in school and extracurricular activities. Hunter also noted that at that time, Israel's other two children were living in Virginia with their mother. However, Hunter said that M.C.B. had told Rosetta that she felt Israel treated his other children differently, e.g., letting the others get their ears pierced. Hunter reported that Rosetta had one other child, a daughter aged twenty-one, who was serving in the Air Force as well.

¶12. In her report, Hunter concluded that M.C.B. was a product of "the unstable and nearly non-existent co-parenting relationship of her parents." In talking to M.C.B. about her father, Hunter stated that M.C.B. was "hyper-sensitive" to Israel's every comment, decision, or action. Hunter also concluded that Rosetta had taught M.C.B. to disregard any parental decision or action of her father. Lastly, Hunter also commented that Rosetta failed to notify Israel and Dr. Casey about M.C.B.'s medication regimen. Hunter noted that Rosetta denied such claims.

¶13. Hunter stated in her report that she did not find a substantial and material change in circumstances in Israel's household such that modification of custody would have been in

---

[5] None of the child's medical records were presented to the chancery court or appear in the record.

the best interest of M.C.B. However, she did note:

> I don't know how it [the custodial schedule] ever worked given its confusing and complex nature. As such, in order to best accommodate the needs of [M.C.B.] and to give her the benefit of both her parents parenting, I recommend the parties maintain joint and physical custody, with custodial periods as follows:
>> The father shall be entitled to physical custody of the child on alternating weeks from Wednesday at 5:00 p.m. until Sunday at 6:00 p.m. and each Wednesday from 5:00 p.m. until school resumes on Thursday morning. The Mother should have all other periods.

*Hearing*

¶14.    At a hearing on Rosetta's petition for modification on April 22, 2022, Hunter presented her findings from her report to the court. She stated that Israel's and Rosetta's parenting styles were "vastly different," which caused intense conflict over small issues. To illustrate her point, Hunter brought up an altercation between Israel and Rosetta over M.C.B.'s cell phone. Hunter mentioned that there was a difference of opinion between the two over how M.C.B. should use her cell phone. Specifically, Israel did not want M.C.B. to have social media on her phone, and Rosetta agreed. However, Israel later discovered that M.C.B. had a second phone for social media. Hunter believed that Rosetta gave her the phone and told her to not tell Israel. Rosetta denies that claim. When the chancellor asked Rosetta about the phone, she explained that the phone had belonged to her sister, and M.C.B. began using it after Rosetta's sister purchased a new phone.

¶15.    When Hunter asked M.C.B. about the second phone, M.C.B. said that she felt Israel had no right to know about it because it was her aunt's phone, and her dad was not paying

7

for it. When Hunter informed M.C.B. that Israel had a right to see the phone, M.C.B. became visibly upset, so much so that M.C.B. refused to talk to Hunter thereafter.

¶16. After hearing about the phone, the chancellor asked Hunter if the parties could agree on anything—"find a common ground"—for the sake of M.C.B. The chancellor referred to a report prepared by a psychologist who had interviewed the parties and assessed their parenting skills.[6] Hunter responded that a court order was needed. She stated that "[w]hen they're told to do something, they unite to do it. But without an order in place, they just kind of both seem to think that they know best, and it causes some chaos."

¶17. The chancellor allowed the attorneys to question Hunter. Israel's attorney asked Hunter to explain her finding that Rosetta was undermining Israel as a parent. Hunter explained that as in many families, one parent is stern and more regimented, while the other is more relaxed and free-spirited. Hunter said, in Israel and Rosetta's case,

> [Israel] is assigned the stern, un-fun parent and [Rosetta] is the more fun, relaxed, accepting parent. I don't know how else to say it besides that by her actions and not supporting decisions that [Israel] makes or his opinion about things, I think [Israel] makes or his opinion about things, I think that sends the message to [M.C.B.] that what your daddy wants doesn't count.

¶18. After the lawyers questioned Hunter, the chancellor addressed Rosetta directly, asking her to explain the cell phone situation.[7] Rosetta stated she did not give M.C.B. the phone,

---

[6] Both parties had submitted to a psychological evaluation, and a report dated December 4, 2021, was filed for the court's review.

[7] We note the informal manner in which the court proceeded. At the beginning of the hearing, Hunter, Israel, and Rosetta were all sworn. After Hunter's presentation and questions from the court and the attorneys, the chancellor proceeded in an informal manner,

8

but she was aware that M.C.B. was using her sister's phone. Rosetta then criticized Israel for being more concerned about the phone than about M.C.B. harming herself.

¶19. The chancellor then stressed the importance of being a "united front" for their child:

> You know, a Court order can say, the two of you shall talk and agree on a united plan. But if the two of you do not put your heart and soul into developing that plan, whatever it may be, finding common ground and reassuring this child what that plan is, you're continuing on the road that you're on.

Both parents then expressed that they were both committed to doing what was best for M.C.B. They also confirmed that the counseling sessions were working.

¶20. After the chancellor asked if there was anything else from the parties, Rosetta's attorney stated that he believed that they were there for trial, noting that he was ready to present proof on other issues.[8] The chancellor responded, saying that his focus was to end litigation as soon as possible so the family could "move on." The chancellor proceeded to propose a new plan for visitation, detailing the arrangement for school years, holidays, and summers. Rosetta's attorney disagreed with the plan, arguing that M.C.B.'s self-harming while at the father's residence and Israel's "manipulative and controlling nature" were a material change of circumstances. The attorney said he was prepared to put on proof that Rosetta deserved sole physical custody; however, the attorney made no offer of proof in the

personally questioning the parties. Neither party formally "took the stand" to be questioned by their lawyers, present any documentary evidence, or be cross-examined.

[8] The docket shows the continuance orders leading up to the hearing described the proceeding scheduled for April 22, 2022, as a hearing and a trial.

9

record. After further discussion, the chancellor finalized the plan that was ultimately contained in the final judgment.

¶21. Rosetta's attorney asked the court for child support, pointing to Israel and Rosetta's disparity in income. The chancellor ordered Israel to submit an updated Rule 8.05 financial statement to determine child support. *See* UCCR 8.05. Lastly, Rosetta's attorney asked that no surveillance equipment be placed inside the home during M.C.B.'s visits with Israel because it made M.C.B. uncomfortable. Israel responded that he only had surveillance outside of his home.[9] The chancellor ordered that Rosetta would be authorized to ensure that no surveillance would be inside the home during Israel's visits. The chancellor concluded the proceeding.

*Final Judgment*

¶22. On April 27, 2022, the chancery court entered a final judgment that reflected some of the GAL's recommendations as well as the proposals the chancellor expressed during the hearing. The judgment did not reference any legal precedent. Although the chancellor said that the parties would retain joint physical and legal custody, the chancellor ordered a temporary visitation schedule through the end of the school year, and then "beginning June 8, 2022[,] the Father shall be entitled to physical custody of the child on alternating weeks from Wednesday at 5:30 p.m. until Sunday at 5:30 p.m." The court further ordered "[t]hat at all times not specified herein, unless otherwise agreed by the parties, [M.C.B.] shall be in

---

[9] Israel works in cybersecurity and "intelligence" for the military.

the physical custody of the Mother." The court also enjoined the father from having any surveillance, cameras, or the like inside the home activated while the minor child was in his care or custody. Lastly, the trial court ordered both parties to provide fully completed and updated Rule 8.05 financial statements for the court's review. Upon receipt, the trial court would issue a separate order addressing the child support obligation to the father.

¶23. On May 6, 2022, the chancery court entered a judgment setting child support, ordering Israel to pay Rosetta $1,491.42 per month, beginning June 1, 2022. The court based this amount on Israel's Rule 8.05 financial statement in the record at the time, which showed that Israel had a monthly income of $11,587. Notably, Israel included in his expenses $1,700 per month child support for his other two children.

*Post-hearing Motions*

¶24. On April 29, 2022, Rosetta filed a motion to alter or amend the judgment or, in the alternative, a new hearing. Rosetta claimed that the judgment contained manifest errors of fact or errors of law and constituted an abuse of discretion. Rosetta also alleged that all the matters were not properly addressed, including (but not limited to) child custody, child support, and visitation, and she alleged that Israel (mistakenly referred to as "the plaintiff") came to court with "unclean hands." Lastly, she claimed that the judgment failed to protect and serve the best interest of M.C.B.

¶25. On May 3, 2022, Israel submitted a revised Rule 8.05 statement to the trial court, in which he noted rental income from which he deducted rental expenses. This time, he listed

11

his child support obligation as $3,200 (the sum of $1,700 obligation for his other two children and the $1,491.42 he was paying for M.C.B.).

¶26.   On May 31, 2022, Israel filed a motion for a new trial and to stay the execution of the chancery court's judgment setting child support.  Israel objected to the court's determination of child support, which he argued was not pleaded as an issue in Rosetta's petition of modification of custody. and not an issue he had consented to try.  He also alleged that the order for child support was unsupported by evidence and failed to consider the material change in circumstances of the parties.

¶27.   On August 1, 2022, Israel filed a motion for contempt.[10]  He claimed that Rosetta should be held in contempt because she (1) hid medication in M.C.B.'s bag, (2) refused to allow the child to talk to Israel on June 6, 2022, (3) denied Israel's summertime visitation with his daughter, and (4) scheduled therapy sessions with a different therapist.

*Hearing and Judgment on Post-hearing Motions*

¶28.   On May 17, 2023, the court held a hearing on the parties' respective motions, including Rosetta's motion for a new trial, Israel's motion for a new trial, and Israel's motion for contempt.  It appears that during this hearing, the court was presented with an updated Rule 8.05 financial statement that Israel had prepared on March 22, 2023, and filed in another case (*Briggs v. Seantay Jackson*, Jackson County Chancery Court Cause No. 2020-01968-MAM).  This Rule 8.05 statement supplemented his previous Rule 8.05 statement that

_____

[10] This motion was not included in our record.

12

he had signed on April 25, 2022, and filed in this case.[11] At this point, both parties were proceeding pro se. Israel presented his arguments first. Concerning his motion to set aside the judgment of custody, Israel argued that Rosetta failed to prove the elements required to modify the 2009 child custody and support order. Next, he argued that an increase in income alone was not enough to warrant modification of child support. Finally, he claimed the court should have considered his obligation to pay $1,700 in child support for his other children in determining the amount to be paid in the case at hand. Israel then argued that the court erred in enjoining him from using surveillance equipment at his home when there was no evidence during the trial as to why this ruling was necessary. While presenting his motion to hold Rosetta in contempt, Israel argued that he was owed two days of missed visitation.

¶29.    Rosetta responded by explaining that the two days of visitation were missed due to an altercation between the parties. Rosetta also explained that Israel constantly denied multiple recommendations for M.C.B.'s mental health by medical professionals. Rosetta did not mention her motion to alter or amend at the hearing. She did, however, tell the court that she had no problem with the court's order concerning child support.

¶30.    The chancellor took the parties' statements under advisement, and on August 11, 2023, the court entered a final judgment on the outstanding motions. Concerning the

---

[11] In its August 11, 2023 final judgment, the court noted that it had updated financial information. In its order supplementing the record on appeal, pursuant to Mississippi Rule of Appellate Procedure 10(e), the court included "Exhibit 9," which is the financial statement Israel prepared and filed in the other civil case.

modification judgment, the court clarified that it is accorded "substantial discretion and is charged to consider all relevant facts and equities, to the end that a decree serving the best interest of the children may be fashioned." Concerning child support, the court noted that Israel's updated Rule 8.05 statement reflected an annual income of over $100,000. Because the court found nothing in the record that suggested a need to deviate from Mississippi's statutory child support guidelines, the court found that the best interests of the child warranted an upward modification of child support and ordered Israel to pay $1,679.16 in child support. Lastly, the court ruled that Rosetta withheld a total of two days of visitation from Israel. The court found her in contempt, ordered her to pay Israel $500 in attorney's fees, and denied all other motions.

*Appeal*

¶31. After the court's final judgment, Israel appealed. Thereafter, Israel retained counsel who briefed the issues. Israel argues that the chancery court's modification of the 2009 agreed judgment was rendered without substantial evidence or a finding of a material change in circumstances, contravening established Mississippi caselaw. Additionally, Israel argues that the court erred in increasing his child support obligation for M.C.B. He also argues that the court lacked subject matter jurisdiction to impose upon him a "home surveillance permanent injunction" because there was no clear and convincing evidence of necessity or imminent harm to the child. Lastly, Israel argues that he should be reimbursed for any child support paid in excess of the previously ordered amount of support.

14

¶32. Rosetta, who is not represented by counsel, has failed to file a brief in opposition.

## Standard of Review

¶33. Our "standard of review for a child-custody case is a narrow one." *Munday v. McLendon*, 287 So. 3d 303, 309 (¶25) (Miss. Ct. App. 2019). We "will affirm the child-custody decree if the record shows any ground upon which the decision may be justified." *Brumfield v. Brumfield*, 49 So. 3d 138, 142 (¶9) (Miss. Ct. App. 2010) (emphasis added). In addition, "[t]his court will not disturb a chancellor's findings unless they were manifestly wrong or clearly erroneous, or the chancellor applied an erroneous legal standard." *Walker v. Walker*, 210 So. 3d 996, 998 (¶4) (Miss. Ct. App. 2015).

¶34. Like the chancellor, "our polestar consideration," in child-custody decisions "must be the best interest of the child." *Montgomery v. Montgomery*, 20 So. 3d 39, 42 (¶9) (Miss. Ct. App. 2009) (quoting *Hensarling v. Hensarling*, 824 So. 2d 583, 587 (¶8) (Miss. 2002)). We will not arbitrarily substitute our judgment for that of the chancellor, who is in the best position to evaluate all factors relating to the best interest of the child. *Mosley v. Mosley*, 784 So. 2d 901, 905-06 (¶15) (Miss. 2001).

## Discussion

¶35. Before addressing the merits, we recognize that Rosetta did not file a brief. "In matters of child custody and support, . . . in the absence of an appellee's brief, our practice is to make a special effort to review the record for support for affirmance." *Edwards v. Edwards-Barker*, 875 So. 2d 1126, 1128 (¶5) (Miss. Ct. App. 2004) (quoting *Barber v.*

15

*Barber*, 608 So. 2d 1338, 1340 (Miss. 1992)). When child custody is at issue, "this Court is compelled to review the record" despite the appellee's failure to file a brief. *Shows v. Cross*, 238 So. 3d 1224, 1232 (¶31) (Miss. Ct. App. 2018) (quoting *Vassar v. Vassar*, 228 So. 3d 367, 374 (¶22) (Miss. Ct. App. 2017)). We do this because "when matters on appeal touch the welfare of a minor child, . . . regardless of whether a party filed a brief, this Court will reach the merits of the issues in this appeal, though we proceed unaided by a brief from the appellee." *N.E. v. L.H.*, 761 So. 2d 956, 962 (¶14) (Miss. Ct. App. 2000).[12]

## I. Modification of 2009 Agreed Judgment

¶36. Israel argues that the chancery court erred in modifying the agreed 2009 judgment without finding a material change in circumstances that was detrimental to the child. Specifically, Israel claims that reducing his joint custody periods from fifteen overnight stays to eight overnight stays a month modified the order and granted sole physical custody to Rosetta. Further, Israel argues that the court did not conduct an *Albright* analysis to

---

[12] When a matter does not involve a minor, there are two options in addressing an appellee's failure to file a brief.

> The first alternative is to take the appellee's failure to file as a confession of error and reverse when the record is complicated or of large volume and the appellant's brief thoroughly makes out an apparent case of error with apt and applicable citation to authority. When the record can be conveniently examined, the second alternative is to affirm when such examination reveals a sound and unmistakable basis or ground upon which judgment may be safely affirmed.

*In re L.T. v. Youth Court of Warren County*, 335 So. 3d 599, 602 (¶6) (Miss. App. Ct. 2022) (quoting *Walker*, 210 So. 3d at 998-99 (¶5)).

determine which parent should be granted custody.

¶37. A modification of custody is warranted when the moving parent successfully shows "(1) that a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child." *Schmidt v. Schmidt*, 339 So. 3d 163, 174 (¶32) (Miss. Ct. App. 2022) (quoting *Munday*, 287 So. 3d at 310 (¶27)). "The burden is on the parent requesting a change in custody to prove a material, adverse change of circumstances by a preponderance of the evidence." *Voss v. Doughty*, 242 So. 3d 952, 956 (¶13) (Miss. Ct. App. 2018) (quoting *Staggs v. Staggs*, 919 So. 2d 112, 115 (¶11) (Miss. Ct. App. 2005)). "Once that burden is met, the chancellor must apply the *Albright* factors to determine whether modification of custody is in the best interest of the child." *Hendrix v. Whitt*, 373 So. 3d 778, 795-96 (¶55) (Miss. Ct. App. 2023).

¶38. In order to properly address a modification of custody, the chancellor must "first identify the specific change in circumstances, and then analyze and apply the *Albright* factors in light of that change." *Roberts v. Roberts*, 110 So. 3d 820, 830 (¶31) (Miss. Ct. App. 2013). In *Roberts*, the chancellor modified a custody order after finding, without explanation, a material change in circumstances that adversely affected the minor. *Id*. The chancellor's order did not contain any analysis of specific changes in circumstances or a discussion of the *Albright* factors. *Id*. On appeal, this court reversed the chancellor's decision because the chancellor did not first identify a specific change in circumstances that

17

adversely affected the welfare of the child. *Id.*

¶39. The initial question in this case was whether the chancery court's change of custodial periods constitutes a modification of the 2009 order. Although the court only changed the dates of the custodial times that each parent would have, a significant change in "visitation" can constitute modification of custody, as we held in *Johnson v. Johnson*, 913 So. 2d 368 (Miss. Ct. App. 2005). In that case, the parents were awarded joint legal and physical custody of their four-year-old daughter in their 2002 judgment of divorce. *Id*. at 369 (¶1). The judgment provided that the child would reside with the parties for an equal amount of time and that neither would pay child support. *Id*. at (¶3). The original custodial periods the parties came up with accommodated the mother's work schedule of three nights on and two nights off. *Id*. at (¶4). When her work schedule changed, she sought a modification. *Id*. The trial court ultimately issued a judgment, saying that there were no material changes in circumstances, but it was in the best interest of the child to change the "visitation schedule." *Id*. at 370 (¶10). The chancery court then specified the father's visitation to include every other weekend, half of the spring break, one week at Christmas, and six weeks in the summer. *Id*. at 370-71 (¶10). This Court reversed the chancery court's ruling, holding:

> Regardless of the terminology utilized in the order, the trial court's order in essence modified the original decree as to custody. We are unwilling to hold that a chancellor may modify custody without finding the requirement of a substantial and material change in circumstances that adversely affects the child's welfare.

*Id*. at 371 (¶11).

¶40. We applied and quoted *Johnson* in *Phillips v. Phillips*, 303 So. 3d 835 (Miss. Ct. App.

18

2020). In that case Meagan and Richard entered into an agreed order modifying custody to allow their two minor children to move to New York to live with the father to pursue acting careers and other relevant training. *Id*. at 837 (¶1). The agreed order was temporary, beginning on July 1, 2017, and would expire in a year, after which the parties would evaluate the situation. *Id*. at 837 (¶1). After three months, Meagan changed her mind and filed a motion to set aside the temporary agreed order modifying custody. *Id*. at 837-38 (¶4). The chancery court held a hearing on the matter on July 1, 2018. *Id*. at 838 (¶5). The chancery court noted that under its own terms, the temporary order had expired. *Id*. The court further noted how well the children were doing in New York and decided to let them remain. *Id*. Although the court had asked the parent to work out visitation in the future, the court eventually ordered that the children visit Mississippi once a month and that both parties share the cost of the plane tickets. *Id*. at 839 (¶¶9-10). In the mother's appeal of the order allowing the children to stay with their father in New York, this Court noted that the chancellor did not find a material change in circumstances, nor did the chancellor conduct an *Albright* analysis when granting custody to the father. *Id*. at 840 (¶17). We held that the chancellor's order amounted to a permanent modification of the parties' original joint custody agreement. *Id*. at (¶16). We reversed the order, citing both *Johnson*, 913 So. 2d at 371 (¶11), and *Roberts*, 110 So. 3d at 830 (¶31), and noting that the parties originally shared joint custody and that the chancery court had in fact made a temporary order permanent and changed custody without first finding a material change in circumstances. *Id*. at 840 (¶17).

19

¶41. In the case at hand, the court's change of Israel and Rosetta's "custodial time periods" constituted a modification of the prior order, essentially changing it from joint custody to primary custody awarded to the mother. In the 2009 order, Israel had the child for fifteen overnight stays (approximately half of each month) for every month of the year. Under the new visitation schedule, Israel had only two extended weekends a month (eight overnight stays) and two weeks in the summer. Under *Johnson*, this constituted a modification of custody. Because the court was modifying the custody provision of the 2009 judgment, the court was required to find that a material change in circumstances existed that adversely affected the child and use the *Albright* factors to determine which parent should have custody if not joint. *Id.* Because the chancellor did not make these findings, we reverse and remand for further proceedings to determine whether there has been a material change in circumstances warranting a change in the custody provisions to serve the best interest of the child.

## II. Other Issues

¶42. Israel also raises issues on appeal regarding the chancery court's rulings increasing his child support obligations and enjoining him from using surveillance cameras at his home. Because we have determined that the judgment modifying the custody arrangement was made in error and reverse, on remand, the court should address these issues as well, including child support. With respect to child support, we note that the trial court had before it two financial statements from Israel, one dated April 25, 2022, and one dated March 22, 2023, made in

20

preparation of a separate matter involving Israel. It is unclear which statement the court used to determine Israel's child support obligations in the August 11, 2023 judgment. Additionally, the chancery did not detail how it arrived at $11,994 in calculating Israel's adjusted gross monthly income after subtracting what the court termed "legally mandated deductions."[13]

¶43. Upon remand, the chancery court shall address the custody issue by determining if there has been a material change in circumstances adversely affecting the child warranting a change in custody that is in the child's best interest. The chancery court's decision on that issue will determine if either parent will be paying child support in the future. When considering what amount of child support to order, if any, the court shall request updated financial information from the parties and make detailed findings concerning its calculation of the amount. Miss. Code Ann. 43-19-101 (Rev. 2023). The court must also take into account Israel's other child support obligations pursuant to section 43-19-101(3)(c), which provides that if the child support payor "is subject to an existing court order for another child or children," then "subtract the amount of that court-ordered support" from his adjusted gross

---

[13] On the 2022 Rule 8.05 financial statement, Israel reported gross monthly income (including rental income) of $14,987, and after deductions for taxes, Medicare, and expenses for his rental property, he had an adjusted gross monthly income of $8,941. However, on his 2023 Rule 8.05 financial statement, Israel reported gross monthly income of $16,065 (including rental income), and after similar deductions, he had an adjusted gross income of $9,364. Also, neither of these adjusted gross incomes includes the $1,700 child support obligation Israel was also paying. So it is unclear how the chancery court dealt with Israel's other child support obligation and the rental income expense to arrive at an adjusted gross income of $11,994 on which it based its child support order.

21

income. In addition, the court should take into consideration any expenses incurred in generating the rental income. "Generally, self-employment income amounts to gross income less ordinary and reasonable expenses incurred in producing the income." *Myles v. Lewis*, 388 So. 3d 598, 609 (¶25) (Miss. Ct. App. 2024) (quoting *Faerber v. Faerber*, 13 So. 3d 853, 864-65 (¶43) (Miss. Ct. App. 2009)). The court can also address any issue concerning reimbursement of child support if necessary. Moreover, the chancery court can address the effect of surveillance on the child and determine whether any rulings concerning that matter need to be made.

## Conclusion

¶44. Although Rosetta failed to file an appellee's brief, we have reviewed and addressed the merits of the issues on appeal. Because the chancery court's change in the parties' custodial periods in essence awarded sole physical custody to Rosetta, the chancery court modified the 2009 order's joint physical custody provision. However, because the chancery court did not find a material change in circumstances adversely affecting the child prior to modifying the custody arrangement, we reverse for a determination on that issue. If the court finds such a material change in circumstances, it must then determine custody of the child by applying the *Albright* factors. Further, on remand, the chancery court must request the updated Rule 8.05 financial statements and make a detailed calculation of the child support to be paid by either or both parties. In addition, the court should make findings regarding Israel's gross rental income minus his business expenses to arrive at net rental income for

22

purposes of calculating child support, if any. For these reasons, we reverse and remand the matter to the Jackson County Chancery Court for further proceedings consistent with this opinion.

¶45. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McCARTY, SMITH, EMFINGER AND WEDDLE, JJ., CONCUR. LAWRENCE, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**