# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00245-COA

**JENNIFER LADNER BIRD**                                                    **APPELLANT**

**v.**

**JOSHUA J. LADNER**                                                           **APPELLEE**

DATE OF JUDGMENT:                01/26/2024
TRIAL JUDGE:                            HON. MICHAEL CHADWICK SMITH
COURT FROM WHICH APPEALED:   FORREST COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       RICHARD ALLEN FLOWERS
ATTORNEY FOR APPELLEE:        JOSHUA J. LADNER (PRO SE)
NATURE OF THE CASE:             CIVIL - DOMESTIC RELATIONS
DISPOSITION:                    AFFIRMED IN PART; REVERSED AND
                                REMANDED IN PART - 08/26/2025
MOTION FOR REHEARING FILED:

     **EN BANC.**

     **LAWRENCE, J., FOR THE COURT:**

¶1.     Joshua Ladner and Jennifer Ladner Bird divorced on March 25, 2008. The parties had two children: Nicolas, who was emancipated by his age during the proceedings, and Haley, who was a teenager at the time. The original divorce order required Joshua to pay Jennifer child support in the amount of $900.00 a month. The order also required each party to pay one-half of medical, dental, ocular, orthodontic, and other related expenses for their minor children not covered by insurance. Joshua was ordered to provide medical insurance for them at his own cost. On June 8, 2020, Jennifer filed a petition for contempt and modification of child support against Joshua. At the hearing, the chancellor denied Jennifer's petition for contempt, but he granted Jennifer's requested relief for child support. The chancellor

retroactively increased child support and ordered reimbursement of insurance premiums. Jennifer appealed from the order denying her petition for contempt and argues, *inter alia*, the chancellor improperly calculated Joshua's child support obligation.

## FACTS AND PROCEDURAL HISTORY

¶2.     Jennifer filed her petition for contempt and modification of the original divorce order on June 8, 2020. A hearing occurred on February 15, 2023. In the motion and at the hearing, Jennifer requested that Joshua be held in contempt for unpaid child support, failure to provide medical insurance, and failure to pay for uninsured medical expenses. As part of her request for modification of the original divorce order, Jennifer requested the court modify the provision in the order for a 50/50 split of all uninsured medical, dental, and orthodontic costs to be a 75/25 split, with Joshua paying 75% and Jennifer paying 25% of the expenses. Jennifer also requested that all such payments be paid within ten days of Jennifer providing Joshua with proof of the expense. Jennifer also sought to claim Haley on her income taxes each year. Finally, she requested that Joshua's child support payments be increased.

¶3.     At the contempt and modification proceeding on February 15, 2023, Jennifer was called to testify. She testified that Joshua did not pay for the children's medical insurance as required by the divorce order. She testified that the children were "covered under Medicaid" but were removed from Medicaid when "[her] income increased." She then put the children on her insurance plan. In an effort to pay for the children's medical insurance as the court order required, Joshua voluntarily increased his monthly child support obligation by $300.00,

2

making his total payments $1,038.00 due each month rather than the court ordered $738.00.[1]
In Joshua's testimony, he explained that "[Jennifer] agreed to move the child support from
[$]738 to [$]1,038 and that she would provide 100 percent of the insurance and anything
medical . . . for the children. . . ." However, Jennifer testified that the extra $300.00 was
solely "to cover the cost of insurance" and that Joshua was still obligated to pay for medical
costs and expenses.

¶4.　　Jennifer submitted a summary of insurance costs and requested reimbursement for the
health insurance premiums she paid on behalf of the minor children from June 2020 through
the trial date in February 2023. The total insurance costs she claimed she paid for the minor
children totaled $3,439.00. This figure reflected the emancipation of Nicolas in July 2021.
Additionally, Jennifer provided health insurance premiums from February 2023 to August
2023, which was the time between the trial date and when the final judgment was entered,
totaling $708.00.

¶5.　　Furthermore, Jennifer testified that Joshua owed $4,848.36 in uninsured health
expenses for the children. She testified that she did not include the expenses in the summary
because she had notified Joshua of the expenses "in the past and he returned it or refused to
pay it." Jennifer also testified that "[Joshua] said he paid child support; that was all he was
going to pay."

---

[1] On September 24, 2020, Joshua's monthly obligation was modified by a temporary order from the original $900.00 per month to a decreased amount of $738.00 per month.

¶6.     Jennifer also requested the chancellor to increase Joshua's monthly child support obligation to an allegedly age- and income-appropriate amount of $1,350.00. At the time of trial, Joshua was under a court order to pay $738.00 per month in child support. Jennifer testified that Joshua's income had significantly increased since their divorce and that their son's transition to college had resulted in higher living expenses for her, including his increased food and rent costs.

¶7.     Jennifer's attorney introduced two of Joshua's Rule 8.05 financial statements into evidence. *See* UCCR 8.05. The first statement was dated February 3, 2022. Joshua testified that he had not provided a financial statement sooner because he "believe[d] [he was] never provided with one." He stated that he completed the first Rule 8.05 statement "when [his] attorney told [him] to fill it out" and did so based on the "judgment" and "advice of his attorney." The second financial statement was dated June 13, 2022. Joshua failed to include his bank account information in both statements and did not include all his pay stubs. In the Rule 8.05 statements, he reported his adjusted gross monthly income as $7,307.74.

¶8.     Jennifer's attorney alleged Joshua should be held in contempt for not being truthful about when he was able to return to work after the COVID-19 pandemic. Jennifer's attorney referred back to the temporary order entered on September 24, 2020, which required the following:

> Joshua shall notify the Court and counsel for Jennifer immediately upon his receipt of income for himself, whether employment or unemployment, by way of an amended 8.05 statement with appropriate attachments.

4

Jennifer alleged that Joshua failed to notify the court or Jennifer's counsel about any job change until he filed his first financial statement in February 2022. Joshua testified that before he started his own mobile welding business in 2023, he was "self employed." He would "work [as a welder] for different companies and different people." Joshua explained that he did what was referred to as "shutdown" or "turnaround[]" work.

¶9. Joshua testified that he did not notify the court or Jennifer's counsel of his welding jobs or job at a construction company (Aptim) because he was not "fully conscious or [did not] remember or . . . had forgotten" that he was required by court order to notify her. He also testified he "more than likely, wasn't aware that [he] had to notify" anyone of his employment. And "if [he] did, [he] just didn't do it" because he "was trying to get back on [his] feet" and needed to pay his house note "before [he] started paying more outside of something else."

¶10. In an effort to prove that Joshua had been untruthful about his income, Jennifer's attorney referred back to a transcript of a prior hearing held between the parties on August 18, 2020.

| ATTORNEY: | . . . And so this is you speaking as of August 18, 2020. "Joshua has testified that he is unemployed due to Covid-19-related industry shutdowns." Was that true? |
|---|---|
| JOSHUA: | Yes. |
| ATTORNEY: | You were not working? |
| JOSHUA: | No, sir. |
| ATTORNEY: | Nowhere? |
| JOSHUA: | No, sir. |
| ATTORNEY: | You are certain? |
| JOSHUA: | I'm certain. |

5

| ATTORNEY: | And has -- "Joshua has not been working since March of 2020." Are you certain about that? |
|---|---|
| JOSHUA: | Yeah. The facts that I stated at that time, I had been on unemployment at that time. |
| ATTORNEY: | You were on unemployment, disrupted for reasons beyond your control. So was that true? You were on unemployment -- you were on unemployment benefits? |
| JOSHUA: | Yes, sir. I was receiving unemployment. |

¶11. However, a document entered into evidence stated that Joshua started working at Aptim on August 17, 2020, which was the day before he testified he was unemployed at the time of the temporary hearing on August 18, 2020.

| ATTORNEY: | Now, you lied to the Court in August. |
|---|---|
| JOSHUA: | No, I didn't. |
| ATTORNEY: | Didn't you? |
| JOSHUA: | I wouldn't have said I wasn't working if I was working. |
| ATTORNEY: | I'm sorry? |
| JOSHUA: | I said that I wouldn't have said I wasn't working if I was working. |

¶12. Additionally, Jennifer contended at the hearing that Joshua should be held in contempt because he unilaterally decreased and halted his child support payments. She testified that she had to "start[] working more to compensate for the lost income." Joshua testified that he decreased his child support payments when his son reached the age of majority, Joshua reduced the child support payments from $738.00, which was 20% of his adjusted gross income to $517.00, which was 14%. Joshua testified that he "went through legal counsel" and lowered his $738.00 a month child support payments to $517.00. He testified that he "was under the idea" that he followed the proper procedures to reduce his child support payments. Joshua also testified that he stopped paying his child support in February 2022

6

"under legal advice" after his youngest child, Haley, expressed a desire to live with him.[2]

However, Jennifer did not want Haley to move in with her father and "begged" her to stay. As a result of Jennifer's pleading, Haley stayed with her mother for eight more months. In October 2022 (when Haley turned eighteen), Haley moved out of her mother's house and into her father's house. Jennifer testified that "there [was] nothing [she] can do about" Haley moving in with Joshua because she was eighteen years old.

¶13.  Joshua's attorney requested to withdraw as counsel for Joshua on July 8, 2022, and the court accepted her request. After hearing the testimony of the two parties, the chancellor ordered Joshua to reimburse Jennifer $3,547.00 for the insurance premium reimbursement. The chancellor determined this amount by subtracting $600.00 from $4,147.00 (the amount Jennifer claimed was the total health insurance premiums she paid for the minor children). The chancellor gave Joshua the $600.00 credit because he voluntarily paid $300.00 extra in child support in June and July of 2020.

¶14.  The chancellor denied Jennifer's claim for the uninsured medical expense reimbursement. Jennifer claimed that the total amount of Joshua's share of the expenses was $4,848.36. The chancellor found that since 2017, less the two months he was given credit for when calculating health insurance premiums, Joshua had paid an extra $300.00 for 36

---

[2] Joshua's testimony was confusing as to why he stopped paying child support in February 2022. He testified that he stopped paying child support in an effort to get Jennifer to go to court so he could get custody of Haley, but Joshua testified that "couldn't ever seem to get [Jennifer] to come to court," and  Jennifer "didn't want Haley in front of the judge."

months, which totaled $10,800.00.

¶15.     As for the child support increase, Jennifer asked the court for at least $1,350 per month rather than the $738.00 per month Joshua was ordered to pay originally. The chancellor calculated potential backpay of Joshua's child support for fourteen months from June 2020 (the date of filing) through October 2022 (the date Haley moved in with Joshua). The chancellor found that from June 2020 to July 2021, Joshua was responsible for supporting both children. The chancellor calculated his monthly child support during that period to be $1,460.00 per month, for a total of $20,440.00, which was based on 20% of his adjusted monthly gross income of $7,307.74. During that period, Joshua only paid $10,332.00, which left a difference of $10,108.00 still owed. From August 2021 to October 2022, Joshua owed support for one child. The chancellor calculated his monthly child support during that period to be $1,023.00 per month, for a total of $15,345.00, which was 14% of his adjusted gross income. During that time, Joshua made seven payments of $517.00, totaling $3,619.00. The difference Joshua still owed for that period was calculated at $11,726.00. Combining the amount owed for the two periods, the chancellor found that Joshua owed $10,108.00 plus $11,726.00 for a total of $21,834.00 in back child support. The chancellor determined that once Haley moved in with Joshua in October 2022, he should be granted a credit of $5,000.00, which reflects ten months of child support based on Jennifer's adjusted gross income of $500.00. The chancellor subtracted Joshua's $5,000.00 credit from his $21,834.00 in back pay to determine that Joshua owed Jennifer $16,834.00 in back child

8

support.

¶16.   On January 17, 2024, Jennifer moved to alter or amend the judgment or for a new trial. The chancellor denied Jennifer's motions, and she now appeals. On appeal, Jennifer argues that the chancellor erred by not finding Joshua in contempt for failing to comply with Uniform Chancery Court Rule 8.05, failing to pay child support, and failing to provide health insurance and denying Jennifer's claim for reimbursement of uninsured expenses. She also contends that the trial court erred by not sanctioning Joshua for giving false testimony about his income. Lastly, she argues that the chancellor erred in calculating Joshua's child support.

## STANDARD OF REVIEW

¶17.   "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Rhodes v. Rhodes*, 52 So. 3d 430, 435 (¶15) (Miss. Ct. App. 2011) (citations and internal quotation marks omitted). "'Contempt matters are committed to the substantial discretion of the trial court,' and the findings of the chancery court 'will not be disturbed unless manifestly wrong.'" *Hunt v. Hunt*, 289 So. 3d 313, 317 (¶11) (Miss. Ct. App. 2019) (quoting *Gutierrez v. Gutierrez*, 153 So. 3d 703, 713 (¶31) (Miss. 2014)). This Court "will not disturb a chancellor's factual findings unless the chancellor's decision was manifestly wrong or clearly erroneous, or the chancellor applied an improper legal standard." *Rhodes*, 52 So. 3d at 435 (¶15). "We do not substitute our judgment for that of the chancellor's," even if we disagree with the findings of fact and

9

would arrive at a different outcome. *Id.* Our standard of review is de novo when reviewing a chancellor's interpretation and application of the law. *Id*.

## ANALYSIS

¶18.   Jennifer argues the chancellor erred in his opinion and final judgment on several grounds. Specifically, Jennifer argues that the chancellor erred (1) by not finding Joshua in contempt in his unilateral termination of child support when his youngest child, Haley, moved in with him; (2) by not finding Joshua in contempt for repeated failure to follow Rule 8.05 and related orders; (3) by not finding Joshua in contempt for his failure to provide health insurance and denying Jennifer's claim for reimbursement of un-insured healthcare expenses; (4) by not sanctioning Joshua for repeated false testimony about his income; and (5) in calculating Joshua's child support.

¶19.   "Civil contempt orders enforce a private party's rights or compel compliance with a court's order." *Hanshaw v. Hanshaw*, 55 So. 3d 143, 147 (¶13) (Miss. 2011) (citing *Purvis v. Purvis*, 657 So. 2d 794, 796 (Miss. 1994)). "Failure to comply with a court order is prima facie evidence of contempt." *Evans v. Evans*, 75 So. 3d 1083, 1087 (¶14) (Miss. Ct. App. 2011) (citing *McIntosh v. Dep't of Hum. Servs.*, 886 So. 2d 721, 724 (¶11) (Miss. 2004)). "A contempt citation is proper only when the contemner has **wilfully and deliberately** ignored the order of the court." *Gaiennie v. McMillin*, 138 So. 3d 131, 136 (¶13) (Miss. 2014) (emphasis added). However, "a party's reliance on its counsel's advice is sufficient to make a party's violation not willful or deliberate." *McKnight v. Jenkins*, 155 So. 3d 730, 732 (¶7)

(Miss. 2013). Further, "[t]his Court will not reverse a contempt citation where the chancellor's findings are supported by substantial credible evidence." *Witters v. Witters*, 864 So. 2d 999, 1004 (¶18) (Miss. Ct. App. 2004) (citing *Varner v. Varner*, 666 So. 2d 493, 496 (Miss. 1995)).

## I. Whether Joshua should have been held in contempt for his unilateral termination of child support.

¶20. Jennifer's first contempt argument is that the chancellor should have held Joshua in contempt for his termination of child support. Joshua unilaterally decreased his child support payments once their son, Nicolas, became emancipated by his age. Joshua later stopped paying child support altogether when their daughter Haley moved in with him.

¶21. In *Mizell v. Mizell*, 708 So. 2d 55, 64 (¶50) (Miss. 1998), the father ceased paying both child support and college expenses after his child turned eighteen, relying on his attorney's advice that he was no longer obligated to do so. The chancellor did not hold Mizell in contempt because Mizell's actions were based on the advice of counsel and therefore were not wilful or deliberate violations of a court order. *Id.* at (¶¶49, 52). The wife appealed to the Mississippi Supreme Court, which reasoned that "[c]ontempt can only be willful." *Id.* at (¶52). The Court agreed with the chancellor and cited *Cooper v. Keyes*, 510 So. 2d 518, 519 (Miss. 1987), stating that "[a] contempt citation is proper only when the contemner has wilfully and deliberately ignored the order of the court." *Id.* Lastly, the Court stated that "[c]ontempt is to be determined upon the facts of an individual case and is a matter for the trier of fact." *Id.* at 64 (¶53) (citing *Milam v. Milam*, 509 So. 2d 864, 866 (Miss. 1987)). The

11

Mississippi Supreme Court affirmed the chancellor's decision. *Id.*

¶22. Similarly, here, Joshua testified, and the chancellor found, that he acted under the advice of counsel when he lowered his child support payments when his oldest child, Nicolas, reached the age of majority. The chancellor's finding was supported by the fact that on June 26, 2021, Joshua filed a notice of intent to reduce his child support payments from $738.00, which was 20% of his gross adjusted income, to $517.00, which was 14% of his gross adjusted income.[3] Furthermore, Joshua testified:

> I went through legal counsel on this. That is what she come up with. So I'm not sure if I -- I didn't go to law school to know which was the correct way to do it. She done everything. She filed it, sent it. If it was done improper, maybe that is something you should take up with her. I was under the idea and doings that this was correct.

¶23. In March 2022, Joshua, again "under legal advice," stopped paying child support altogether when Haley decided she wanted to live with Joshua rather than Jennifer. However, Haley did not immediately move into Joshua's home. Jennifer "begged" Haley not to live with Joshua, but when she turned eighteen in October 2022, "there [was] nothing [Jennifer] [could] do about it"; so Haley moved in with her father. The chancellor determined that Joshua was acting in accordance with his attorney's advice.

¶24. The dissent argues that the chancellor erred by noting that "Joshua also stopped paying child support when Haley moved in with him." The dissent states Joshua actually

---

[3] Joshua signed the notice of intent, and his attorney signed and mailed the certificate of service for the notice to Jennifer's attorney.

stopped paying child support in March 2022. Be that as it may, the sentence is taken out of context. First, it is taken from the chancellor's findings of facts concerning the payment of attorney's fees and contempt. It is not within the section of the order concerning findings of facts on child support. In the court's judgment concerning child support, the chancellor stated that "[t]he court finds that Joshua's child support obligation to Haley terminated on November 1, 2022, when she moved into his home." The sentence the dissent quotes has the word "also," meaning the chancellor was using that fact in addition to Joshua's argument that he was following "legal advice" in determining contempt or attorney's fees, not the amount or duration of child support. It is without dispute that Joshua stopped paying child support in March 2022 when Haley indicated that she wanted to move in with him. But it is equally as accurate that Joshua still did not pay child support when Haley did, in fact, move in with him in October 2022. It is important to note that Joshua was required to pay the back child support from March 2022 to October 2022 in the chancellor's ruling.

¶25.   Further, the dissent takes issue with the chancellor's finding of a lack of willfulness in not holding Joshua in contempt when he stopped paying child support in March 2022 because he acted, in part, based on "legal advice." Jennifer claimed that Joshua's attorney sent emails proving Joshua had been advised to pay child support. That is true. But the chancellor found that Joshua's reliance on legal advice to stop paying child support was proved, in part, by the notice of intent to decrease child support for the other child. That document was filed on June 26, 2021, and signed by Joshua's attorney. Jennifer maintains

13

that because Joshua's attorney filed a motion to withdraw in July 2022, Joshua's reliance on legal advice as a defense to contempt is wrong.

¶26.    A client can still rely on his counsel's advice even if that attorney has withdrawn, and past legal advice can still guide a client's future action regardless of whether the attorney is still an attorney of record. *See Fairchild v. Gen. Motors Acceptance Corp.*, 254 Miss 261, 265, 179 So. 2d 185, 187 (1965) (holding that a withdrawal by an attorney "does not erase those steps in the proceedings already taken"). The trial court determines the "willfulness" of Joshua's actions in following his attorney's advice, and that is how it should be. Those are factual resolutions for which the chancellor is particularly suited to make. *See Guardianship of Buckalew v. Buccluch*, 62 So. 3d 460, 464 (¶19) (Miss. Ct. App. 2011) (holding that this Court "acknowledges that as the fact finder, the chancellor possesses the best position to evaluate frivolity and determine the facts"); *Murphy v. Murphy*, 631 So. 2d 812, 815 (Miss. 1994) (holding that "[a] chancellor sits as a fact-finder and in resolving factual disputes, is the sole judge of the credibility of witnesses"); *Belding v. Belding*, 736 So. 2d 425, 427 (¶5) (Miss. Ct. App. 1999) (stating that "[i]f there is substantial evidence in the record to support fact-findings, no matter what contrary evidence there may also be, the appellate court will uphold the chancellor" (quoting *Smith v. Jones*, 654 So. 2d 480, 485 (Miss. 1995))).This Court  never laid eyes on Joshua during his testimony or observed his demeanor or judged his credibility. Those determinations were left to the trial court, not an appellate court.

¶27.    "To be found in contempt, a party has to willfully and deliberately violate a court

14

order," and "a party's reliance on its counsel's advice is sufficient to make a party's violation not willful or deliberate." *McKnight*, 155 So. 3d at 732 (¶7) (citing *R.K. v. J.K.*, 946 So. 2d 764, 778 (¶41) (Miss. 2007)). After review, we find no abuse of discretion or manifest error in the chancellor's final determination that Joshua was not in contempt for failing to pay the proper child support.[4]

¶28. The dissent does make a persuasive argument that the chancellor should have held Joshua in contempt. The issue of contempt involves a willfulness element that can depend on resolving factual issues. The chancellor considered the evidence and found Joshua not in contempt. The dissent considered the same evidence and wants to find Joshua in contempt. While we may not agree with the chancellor on certain factual resolutions, our job is not to decide how we would determine those factual issues but whether the chancellor had substantial evidence to support those findings. *See Rhodes v. Rhodes*, 52 So. 3d 430, 435 (¶15) (Miss. Ct. App. 2011). Here, the chancellor found the evidence proved Joshua's lack of willfulness in violating the court orders. While we wholeheartedly agree with the dissent that court orders are to be followed and respected, we must also respect the boundaries of this

---

[4] This opinion should never be misjudged to stand for the proposition that unilateral actions in violation of court orders are somehow justified or acceptable under our law. Let there be no misapprehension, obtaining a modification order from court before unilaterally acting contrary to a court order is certainly the wiser and safer course of action. *See Kelley v. Day*, 965 So. 2d 749, 756 (¶18) (Miss. Ct. App. 2007) (citing *R.K.*, 946 So. 2d at 780 (¶50); *Williams v. Rembert*, 654 So. 2d 26, 29 (Miss.1995) ("A parent obligated to pay child support cannot reduce child support payments without a court order, and when such event happens the parent who deviated from his obligation must pay accrued child support.")).

15

Court's role in the fact-finding process and affirm a chancellor's decision if substantial evidence supports his factual determinations.

¶29. However, we do find the chancellor erred by ordering Joshua to completely stop paying child support for Haley once she turned eighteen. Child support obligations exist, by statute, until the child reaches the age of twenty-one. *See* Miss. Code Ann. § 93-11-65 (Rev. 2021). An exception to this obligation is allowed if the child

> [v]oluntarily moves from the home of the custodial parent or guardian, establishes independent living arrangements, obtains full-time employment and discontinues educational endeavors prior to attaining the age of twenty-one (21) years.

*See* Miss. Code Ann. § 93-11-65(8)(b)(ii). Haley may have moved out of her mother's home when she turned eighteen, but she was certainly planning to attend college and pursue her "educational endeavors." The chancellor erred in terminating child support upon Haley reaching eighteen.[5]

**II.     Whether Joshua should have been held in contempt for failing to provide a proper Rule 8.05 financial statement.**

¶30. Jennifer also argued that the chancellor erred by not holding Joshua in contempt for failing to provide a complete and timely financial statement required by Uniform Chancery

---

[5] The dissent also alleges the chancellor erred when he awarded Joshua a credit of child support owed because a custodial parent (Jennifer) cannot pay child support to a noncustodial parent (Joshua). The dissent is correct as to that general statement of law. However, this issue, if indeed it becomes applicable, can be addressed by the chancellor on remand since we are remanding this case on the chancellor's error in terminating child support in contradiction of Mississippi law.

Court Rule 8.05. "Rule 8.05 requires a detailed and truthful disclosure of both parties' finances." *Kalman v. Kalman*, 905 So. 2d 760, 764 (¶11) (Miss. Ct. App. 2004). The Rule 8.05 disclosure is mandatory unless "excused by Order of the Court for good cause." UCCR 8.05. The rule requires "each party in every domestic case involving economic issues and/or property division shall provide the opposite party or counsel, if known [enumerated financial disclosures.]" *Kalman*, 905 So. 2d at 764 (¶11) (quoting UCCR 8.05). "The failure to observe this rule, without just cause, shall constitute contempt of Court for which the Court shall impose appropriate sanctions and penalties." UCCR 8.05. However, "[a] citation for contempt is determined upon the facts of each case and is a matter for the trier of fact." *Kalman*, 905 So. 2d at 762 (¶9).

¶31.     In *Shaw v. Shaw*, 985 So. 2d 346, 350 (¶6) (Miss. Ct. App. 2007), Mrs. Shaw claimed that her ex-husband, Mr. Shaw, should have been sanctioned in contempt because he violated Rule 8.05 by failing to disclose his 401k assets. *Id.* After this Court reviewed the record, it determined that Mr. Shaw did not speak "falsely about his 401K or intentionally attempt[] to conceal the asset from Mrs. Shaw" because "the existence of a 401K account was mentioned in the financial statement provided to Mrs. Shaw." *Id.* at 350 (¶5). This Court explained that "[w]e [do] not . . . state that every failure to file an 8.05 or inaccuracies in an 8.05 financial statement would always justify a citation for contempt." *Id.* at 350 (¶6). This is because "[a] citation for contempt is determined upon the facts of each case and is a matter for the trier of fact." *Id.* (quoting *Kalman*, 905 So. 2d at 762 (¶9)). The Court held that since

17

Mr. Shaw did not "willfully [or] deliberately ignore[] the order of the court" contempt was not warranted and the chancellor did not err. *Id.*

¶32.   Here, the temporary order from September 24, 2020, stated:

> Joshua shall notify the Court, and Counsel for Jennifer, immediately upon his receipt of income for himself, whether from employment or unemployment, by way of an Amended Rule 8.05 Statement, with appropriate attachments.

After the temporary order was filed, Joshua testified that he became employed, but he did not file his first Rule 8.05 statement until over a year after the temporary order was filed. However, that statement was incomplete because it did not contain all his pay stubs or tax returns, which are required by Rule 8.05. During Joshua's testimony, Jennifer asked about the delay in filing a financial statement:

| | |
|---|---|
| **Attorney:** | . . . And it says -- and I quote -- "Joshua shall notify the Court and counsel for Jennifer immediately upon his receipt of income for himself, whether employment or unemployment, by way of an amended 8.05 statement with appropriate attachments." Do you see that, sir? |
| **Joshua:** | Yes, sir. |
| **Attorney:** | You didn't comply with that, did you? |
| **Joshua:** | No, sir. |
| **Attorney:** | Why not? |
| **Joshua:** | I can't give an answer -- correct answer for that. Maybe I, more than likely, wasn't aware that I had to notify. |

Joshua also testified that the delay in filing his Rule 8.05 statement was because "it was under the judgment of [his] attorney -- advice of [his] attorney . . . when [he] provided it." Joshua's attorney withdrew from his matter on July 14, 2022, which was after he filed his financial statements on February 3, 2022, and June 13, 2022. The evidence, therefore, could

18

support Joshua's claim that he was acting upon legal advice. The chancellor is the "trier of fact," not this Court, and the chancellor found:

> There was much testimony at trial regarding Joshua's failure to disclose required financial information. These failures predominantly occurred after his counsel withdrew from this matter. As such, the Court will give a *pro se* litigant some leeway on legal procedure.

The chancellor relied on Joshua's testimony that he was acting under the "judgment of [his] attorney." The chancellor is the one who hears the witnesses testify and "observe[s] their demeanor" and is the best person "to determine the veracity of their testimony." *Madden v. Rhodes*, 626 So. 2d 608, 616 (Miss. 1993) (citing *Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss.1987); *Hall v. State ex rel. Waller*, 247 Miss. 896, 903, 157 So. 2d 781, 784 (1963)). "We will not undermine the chancellor's authority by replacing his judgment with our own." *Id.* Therefore, the chancellor did not err when he found that contempt was not warranted.

### III. Whether Joshua should have been held in contempt for failing to provide health insurance and denying Jennifer's claim for reimbursement of uninsured healthcare expenses.

¶33. Jennifer also argues that the chancellor erred by not finding Joshua in contempt for his failure to provide health insurance and denying Jennifer's claim for reimbursement of uninsured healthcare expenses. It is well settled that "[w]hen reviewing a chancellor's decision, [this Court] will accept a chancellor's findings of fact as long as the evidence in the record reasonably supports those findings. In other words, we will not disturb the findings of a chancellor unless those findings are clearly erroneous or an erroneous legal standard was applied." *Peagler v. Measells*, 743 So. 2d 389, 390 (¶6) (Miss. Ct. App. 1999). "The

19

chancellor, as the trier of fact, evaluates the sufficiency of the proof based on the credibility of witnesses and the weight of their testimony." *See Ellison v. Meek*, 820 So. 2d 730, 734 (¶11) (Miss. Ct. App. 2002).

¶34.    It is obvious that Jennifer and Joshua had an oral agreement for Joshua to pay an extra $300 in child support for medical expenditures. However, Joshua testified that he believed the $300 was for all medical costs, while Jennifer believed they were solely for insurance premiums. Therefore, the chancellor had to weigh their testimonies to determine which was more credible. Joshua testified:

> Jennifer agreed to move the child support from 738 to 1,038 and that she would provide 100 percent of the insurance and anything medical outside of -- for the children for the extra $300
>
> The papers were drawn up, but she nor the judge never signed them. I was unaware of this, so I continued to pay her the 1,038 for all those years, and she never once sent me a bill, notified me saying hey, there is a -- some insurance stuff or here is a bill that I had to pay, anything like that. There was never no dispute over all these years until we come into court on this matter we are on now.

He also testified:

> Okay. So I have never received anything from Ms. Bird of any insurance doings, any unpaid medical bills, dental, anything whatsoever through mail, e-mail, text. Anything whatsoever. And I believe -- well, I have always believed that it was because she agreed to the extra 300 and agreed to paying the insurance, and anything medical related for that extra 300 is the reason she never disputed it through all the years. So if I'm responsible for these things over those years, then that means I overpaid her $300 for almost -- like, three or four years there.

Conversely, Jennifer testified:

20

| | |
|---|---|
| **Attorney:** | You heard Mr. Ladner testify something to the effect of if he paid $1,038 instead of $738 -- I think that is right -- that you had an agreement with him that that extra $300 would take care of insurance premiums and any uninsured health care costs for the children. Do you remember hearing that? |
| **Jennifer:** | I do remember. |
| **Attorney:** | Is that an accurate statement of what you said or did? |
| **Jennifer:** | No. |
| **Attorney:** | In your mind, what was the extra $300 for? |
| **Jennifer:** | To cover the cost of insurance because he did not want a policy in his name for me to have access to. |
| **Attorney:** | Do you know why? |
| **Jennifer:** | Yes. He didn't -- well, I mean, I don't know his reasoning behind it, but he just does not want me having -- he has some reason with me having access to his information of any kind. |

¶35. The chancellor found that the medical expenses totaled $4,848.36. Joshua paid $300.00 per month for 36 months, which totaled $10,800.00. Joshua's testimony explained that there was an oral agreement with Jennifer that the extra money he voluntarily paid her each month was for all medical expenditures and not just medical premiums. Joshua "was unaware" that the documents enforcing the $300 payments were not signed by Jennifer or the chancellor, so Joshua continued to pay the increased child support for over two years. The chancellor's finding was supported by Joshua's testimony that "[t]he papers were drawn up, but [neither Jennifer] nor the judge []ever signed them." "[T]he chancellor, being the only one to hear the testimony of witnesses and observe their demeanor, is to judge their credibility. He is best able to determine the veracity of their testimony, and this Court will not undermine the chancellor's authority by replacing his judgment with its own." *Madden*, 626 So. 2d at 616 (citing *Mullins*, 515 So. 2d at 1189; *Hall*, 247 Miss. at 903, 157 So. 2d at

21

784). We find that the chancellor did not err by not finding Joshua in contempt for his failure to provide health insurance because Joshua did not do so willfully or deliberately.

### IV. Whether the chancellor erred by not sanctioning Joshua for repeated false testimony about his income.

¶36.   Additionally, Jennifer contends that the chancellor erred by not sanctioning Joshua for repeatedly giving "false testimony" about his income. When judges are aware of perjury, they have a duty to consider sanctions or report the perjury to the district attorney when necessary. *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶32) (Miss. 2013) (citing *Jones v. Jones*, 995 So. 2d 706, 711-12 (¶¶13-18) (Miss. 2008)). Since "the chancellor had the opportunity to personally evaluate the witnesses' testimony and the parties' behavior, this Court must be deferential to the chancellor's findings." *Gable v. Gable*, 846 So. 2d 296, 299 (¶12) (Miss. Ct. App. 2003) (citing *Sobieske v. Preslar*, 755 So. 2d 410, 413 (¶11) (Miss. 2000)).

¶37.   The Mississippi Supreme Court discussed the issue of perjury in a domestic-relations matter in *McNeese*, 119 So. 3d at 275 (¶31). There, the ex-husband, Kenton, alleged his ex-wife, Katye, gave false testimony about her relationship with her first husband, Michael. In June, Katye testified that she and Michael were not in a relationship and did not have any "interactions" regarding a relationship with him. *Id.* In October, Katye and Kenton married. *Id.* Kenton argued that Katye must have committed perjury when she testified that she was not in a relationship with Michael because "a relationship could not have developed in that time frame." *Id.* The Mississippi Supreme Court stated that "[t]he chancellor heard the

22

witnesses at trial, reviewed the evidence, listened to the arguments on the parties' motions for reconsideration, and concluded that Kenton's allegations were without merit" and since "[t]his Court gives deference to a chancellor's findings in regard to witness testimony," it found that the chancellor did not err in not reporting Katye's alleged perjury. *Id.* at (¶32).

¶38. Similarly, here, the chancellor heard the witnesses at trial, reviewed the evidence, and listened to the arguments. The chancellor heard Joshua testify that he never lied under oath.

> **Attorney:** Have you ever testified in this court or said anything to the court that wasn't true?
>
> **Joshua:** No, sir.

After analyzing all the evidence, the chancellor did not find it necessary to sanction Joshua for his allegedly false testimony. Since this Court must give deference to the chancellor's finding in regard to witness testimony, we determine that the chancellor did not err by not sanctioning Joshua for his alleged false testimony about his income.

### V. Whether the chancellor erred in calculating Joshua's child support.

¶39. Lastly, Jennifer contends that the chancellor erred in calculating Joshua's child support payments. First, Jennifer contends that by adopting Joshua's adjusted gross monthly income of $7,307.74, the trial court accepted his itemized monthly deduction of $174.58 for "mandatory insurance" and $1,370.00 for "federal income taxes," which were partly refunded. Second, she argues that the chancellor failed to make a written finding to determine if the application of the statutory guidelines was reasonable.

¶40. The chancellor adopted Joshua's itemized monthly deduction of $1,370.00 for

23

"federal income taxes." Jennifer argues that because Joshua received a federal tax refund of $8,074.00, his deduction for federal income taxes should have been $708.00 per month rather than $1,370.00. Mississippi Code section Annotated section 43-19-101(3)(b) states that in order to determine adjusted gross income, we must first:

> (b) Subtract the following legally mandated deductions [from the gross income]:
>
> > (i) Federal, state and local taxes. **Contributions to the payment of taxes over and beyond the actual liability for the taxable year shall not be considered a mandatory deduction**;
> > (ii) Social security contributions;
> > (iii) Retirement and disability contributions except any voluntary retirement and disability contributions

Miss. Code Ann. § 43-19-101(3)(b) (Rev. 2023) (emphasis added). Therefore, the chancellor erred when he did not consider Joshua's tax refund when determining his adjusted gross monthly income.

¶41. Also, the chancellor, while determining adjusted gross income, did include as a deduction for Joshua's health insurance premiums he paid each month. Health insurance was not and has never been approved as a statutory deduction in determining adjusted gross income. Health insurance deductions were discussed in *Wells v. Wells*, 800 So. 2d 1239, 1247 (¶20) (Miss. Ct. App. 2001). In that case, Randy Wells argued the chancellor miscalculated his child support obligation. Pursuant to section 43-19-101, he owed 14% of his adjusted gross income for one child. *Id.* The chancellor set his income at $3,763 per month, resulting in a $563 support payment. *Id.* Randy claims it should be $526.82, factoring in deductions

24

for "health insurance and a savings fund." *Id.* His ex-wife, Renee, argued that those deductions, although ordered by the court, were not mandatory and should not have reduced his income calculation. *Id.* This Court reasoned that in *Lee v. Stewart*, 724 So. 2d 1093, 1097 (¶9) (Miss. Ct. App. 1998), that "paycheck deductions for medical insurance, a 401K retirement fund, and a credit union account were not [found to be] mandatory deductions." Therefore, in *Wells* we found the medical and dental insurance, a 401k retirement fund, a credit union account that Randy was ordered to provide, do not qualify as "mandatory" under section 43-19-101. *Id.* As a result, our Court held that the chancellor did not commit error in declining to consider health insurance when he made his statutory calculation of child support. *Id.*

¶42. Here, the chancellor allowed Joshua's itemized monthly deductions for "mandatory insurance" of $175.58 when calculating his adjusted gross income. Pursuant to *Wells* and section 43-19-101(4) (Rev. 2015), the court ordered that medical insurance premiums for children are not statutorily allowed mandatory deductions. Therefore, the chancellor erred by including the health insurance deductions when calculating adjusted gross income.

¶43. Removing the incorrect health insurance deduction and considering the tax return refund resulted in an adjusted gross monthly income of $8,145.00 for Joshua, instead of the $7,307.74 the chancellor calculated. "If the chancellor errs in his calculation of the non-custodial parent's adjusted gross income or monthly adjusted gross income, we are required to reverse and remand the issue to the chancery court for the chancellor to

recalculate before applying the statutory percentage." *Chapman v. Chapman*, 395 So. 3d 447, 450 (¶4) (Miss. Ct. App. 2024). Accordingly, we reverse and remand the chancellor's child support determination for recalculation. Given this ruling, we will not address whether the chancellor erred by failing to make a written finding on the reasonableness of applying the statutory guidelines.

## CONCLUSION

¶44. After a thorough review of the record, we affirm the chancellor's decisions on all issues except the calculation of child support. We reverse and remand for re-evaluation of the child support calculations consistent with this opinion.

¶45. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON, P.J., AND WEDDLE, J., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., McDONALD AND EMFINGER, JJ., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LASSITTER ST. PÉ, J.; WILSON, P.J., WESTBROOKS, McDONALD AND EMFINGER, JJ., JOIN IN PART.**

**McCARTY, J., DISSENTING:**

¶46. The chancery court's decisions to deny contempt against Joshua, to deny reimbursement for Jennifer expending more than her share of costs, and to forgive Joshua's refusals to pay healthcare costs are beyond repair. The first problem is that the chancery court enabled a litigant to ignore court-ordered child support for the better part of a year and allowed him to ignore the disclosure rules applicable to divorces. Even worse, the chancery

26

court then committed legal errors when it wrongfully credited his arrears for deductions when no payments were made, and then the court ignored their Property Settlement Agreement's binding terms by relieving him of his obligations to pay uninsured healthcare expenses for the children.

¶47. We must reverse because of the legal and factual errors, any one of which require reversal—but taken together, amount to an injustice if we allow the decisions to stand. Accordingly, I respectfully dissent.

## I. Contempt for Intentionally Stopping Child Support Payments and Repeatedly Ignoring Duties to Disclose Financial Statements

¶48. "Parties must take seriously their duty to comply with court orders." *Fresenius Med. Care Holdings Inc. v. Hood*, 269 So. 3d 36, 57 (¶70) (Miss. 2018) (quoting *Bowie v. Montfort Jones Mem'l Hosp.*, 861 So. 2d 1037, 1043 (¶6) (Miss. 2003)). Even more so, "our trial judges also have a right to expect compliance with their orders, and when parties and/or attorneys fail to adhere to the provisions of these orders, they should be prepared to do so at their own peril." *Id.* (quoting *City of Jackson v. Presley*, 942 So. 2d 777, 781 (¶7) (Miss. 2006)).

## A. Non-payment of Child Support Obligations

¶49. The chancery court accepted Joshua's testimony that he fully stopped paying child support due to advice from legal counsel.[6] But the record clearly and unequivocally disputes

---

[6] There is evidence supporting the chancellor's finding that Joshua's *initial reduction* of his child support payments in July 2021 was based on the advice of counsel. Joshua's

27

this allegation.

¶50.    Here, the chancellor's order found:

-    "On June 26th, 2021, the month before he decreased his child support, Joshua filed herein a Notice of Intent to decrease his child support to fourteen percent of his AGI to reflect Nicolas's emancipation, which occurred the following month on July 18."
-    "Joshua argued that he decreased his child support due to legal advice. His attorney at the time signed and filed the aforementioned Notice prior to her withdrawal."
-    "The evidence therefore supports Joshua's claim that he was acting upon legal advice, which is a proper defense to contempt."
-    "Joshua also stopped paying child support when Haley moved in with him."
-    "He again testified that this was due to legal advice."

¶51.    "All that Mississippi law requires in a contempt action involving unpaid child support is a prima facie showing by the party entitled to receive child support that the party required to pay the support has failed to do so." *McPhail v. McPhail*, 357 So. 3d 602, 618 (¶87) (Miss. 2023). Once established, "[t]he burden then shifts to the party who failed to pay to show an applicable defense with 'clear and convincing' proof." *Id*.

¶52.    Our Supreme Court has declared, "[W]here a contemnor defendant claims that he was acting upon the advice of counsel in violation of a solemn decree of the chancery court, this is no defense to a proceeding for contempt, although such fact may be taken into consideration by the chancellor in mitigation of the offense." *In re Dissolution of Marriage of Smith*, 843 So. 2d 735, 738 (¶10) (Miss. Ct. App. 2003) (quoting *In re Est. of Hollaway*,

attorney signed and submitted a notice of intent to decrease on his behalf.

631 So. 2d 127, 134 (Miss. 1993)).

¶53.    First, when Joshua actually quit making payments in March 2022, he was still represented by counsel. However, evidence from his own attorney was presented that undeniably shows his attorney was, in fact, advising him to pay his child support. In June 2022, his counsel emailed Jennifer's counsel asking, "[H]as Mr[.] Ladner paid any of the child support yet?" Even more detrimental to Joshua's testimony, his counsel followed up with another email to Jennifer's counsel stating in no uncertain terms: "I have sent Josh a follow up email on June 30 requesting that he pay the child support." Then only days after that second email, Joshua's attorney filed a motion to withdraw on the ground that "Counsel would contend that the Defendant is not following the advice of counsel . . . ."

¶54.    Second, our review reveals that the chancellor's finding that "Joshua also stopped paying child support when Haley moved in with him" was factually inaccurate. The record clearly shows that Joshua testified his last child support payment was made in February 2022 and that he actually quit paying child support altogether as of March 2022. As Joshua admitted, Haley did not move in with him until after her birthday in October 2022.[7]

¶55.    It is well-settled that "if we are satisfied that the chancellor has manifestly abused the wide latitude of discretion afforded him in such matters," this Court's "duty to interfere

---

[7] Furthermore, even if we take Haley's move as the turning point, the evidence conclusively establishes that Joshua's attorney withdrew from the case a whole 3 months *before* Haley's move. So it is not reasonable to find that he was given the legal advice of counsel or acting under it since he was not even represented by counsel at that time.

arises." *Riley v. Wiggins*, 908 So. 2d 893, 898 (¶11) (Miss. Ct. App. 2005) (quoting *Dunaway v. Dunaway*, 749 So. 2d 1112, 1115-16 (¶5) (Miss. Ct. App. 1999)). The "court's failure to employ the coercive powers available to it to compel a party into compliance with a court's order can constitute an abuse of discretion." *McPhail*, 357 So. 3d at 616 (¶74) (quoting *Allred v. Allred*, 735 So. 2d 1064, 1070 (¶19) (Miss. Ct. App. 1999)). Our courts have repeatedly stepped in to "reverse the chancellor's judgment in part and render judgment" when "the chancellor erred when he declined to find [the party] in contempt." *Roberts v. Roberts*, 110 So. 3d 820, 828 (¶24) (Miss. Ct. App. 2013); *see also Smith v. Smith*, 545 So. 2d 725, 728 (Miss. 1989) (finding that a litigant "cannot, without sanction of the Court, decide when or how she will comply with court judgments").

¶56.    It is clear that Joshua willfully and deliberately chose to stop complying with his obligation to pay support for his daughter 8 months before she moved in with him. And it is undisputed that Joshua deliberately refused to make the court-ordered payments, despite knowing and understanding that the court required him to do so. "It follows that we find the chancellor erred when he declined to find [Joshua] in contempt." *Roberts*, 110 So. 3d at 828 (¶24). Therefore, I would "reverse the chancellor's judgment in part and render judgment for [Jennifer] as to this issue." *Id*.

### B.    Rule 8.05 Financial Disclosures

¶57.    The chancery court used Joshua's self-representation at trial to excuse his non-compliance with financial disclosures. But the record belies this finding, showing he was

30

represented by counsel for a significant period of his refusal to comply and did not follow the advice of his attorney.

¶58. Uniform Chancery Court Rule 8.05 explicitly provides: "Unless excused by order of the court . . . each party in every domestic case involving economic issues . . . *shall* provide the opposite party or counsel, if known, the following disclosures[:]

> (1) A *detailed* written statement of *actual* income and expenses and all marital and nonmarital assets and liabilities;
> (2) Copies of the preceding year's federal *and* state income tax returns, in full form as filed, or copies of W-2s if the return has not yet been filed; and
> (3) A general statement of the providing party describing *employment history and earnings* from the inception of the marriage or *from the date of divorce*.

(Emphasis added). And the rule itself points out: "The failure to observe this rule, without just cause, *shall constitute contempt* of court for which the court shall impose appropriate sanctions and penalties." UCCR 8.05(K). Further, the "failure to comply with Rule 8.05 constitutes a fraud on the court." *Chapman v. Chapman*, 395 So. 3d 447, 451-52 (¶9) (Miss. Ct. App. 2024) (quoting *Collins v. Collins*, 112 So. 3d 428, 433 (¶17) (Miss. 2013)).

¶59. As this Court has previously pointed out, "[t]he fact that [a party] elected not to secure representation in the divorce is of little import, for [R]ule 8.05 *does not except* pro se litigants from compliance." *Kalman v. Kalman*, 905 So. 2d 760, 764 (¶12) (Miss. Ct. App. 2004) (emphasis added). Yet the chancery court ignored this bedrock rule. The chancery court found, "There was much testimony at trial regarding Joshua's failure to disclose required financial information. These failures predominantly occurred after his counsel withdrew from

31

this matter. As such, the Court will give a pro se litigant some leeway on legal procedure."

¶60. Additionally, a review of the record reveals that the chancellor's finding that Joshua's discovery "failures predominantly occurred after his counsel withdrew from this matter" was factually inaccurate, again.

¶61. In September 2020, the chancery court entered a temporary order specifically instructing, "Joshua shall notify the Court, and Counsel for Jennifer, immediately upon his receipt of income for himself . . . by way of an Amended Rule 8.05 Statement, with appropriate attachments." By way of several scheduling orders, Joshua agreed to furnish a Rule 8.05 statement by April 10, 2021, and then by December 5, 2021—but he failed to furnish a Rule 8.05 statement by either deadline. It took Jennifer filing a motion to compel in January 2022 in order to get him to file any information about his finances.

¶62. Joshua filed his first Rule 8.05 disclosure in February 2022—*over 17 months after* he was initially instructed to do so by the chancery court. And not only was this disclosure extremely delayed, it also was not in compliance with Rule 8.05 because Joshua did not provide any of the supporting documents required. After Jennifer filed another motion to compel his full compliance in June 2022, he filed a second Rule 8.05 statement. This time he attached the first page of his 2021 federal tax return, but nothing else. This **does not** satisfy Rule 8.05.

¶63. Joshua's counsel represented him from August 2020 through July 2022. Less than a month later, Joshua's counsel filed her motion to withdraw because he was not following her

advice.

¶64. "Discovery is not to be treated as a game of hide and seek." *Fresenius*, 269 So. 3d at 61 (¶89) (quoting *City of Jackson v. Rhaly*, 95 So. 3d 602, 607-08 (¶11) (Miss. 2012)). "[T]he appropriate remedy for such behavior is to hold [the party] in contempt and enter appropriate sanctions[.]" *Chapman*, 395 So. 3d at 451-52 (¶9) (quoting *Collins*, 112 So. 3d at 433 (¶17)).

¶65. Based on the record, Joshua's failure to timely and properly disclose his financial information as required was deliberate and more like a game of "hide and seek" of his finances for Jennifer. The chancery court erred by giving him "leeway" for such behavior, and Rule 8.05 necessitated finding Joshua in contempt for his non-compliance.

## II. Credit Toward Child Support Arrears

¶66. Next, the chancery court improperly gave Joshua a credit toward his child support arrears for months that he did not actually make any payment. In doing so, the court suspended his ongoing child support obligations and impermissibly retroactively ordered support payments from Jennifer (the custodial parent) to Joshua (the noncustodial parent).

¶67. "Mississippi law permits a non-custodial parent to 'receive credit for having paid child support where, in fact, he paid the support directly to or for the benefit of the child, where to hold otherwise would unjustly enrich the mother.'" *Manley v. Manley*, 378 So. 3d 390, 397 (¶18) (Miss. Ct. App. 2023) (quoting *Baier v. Baier*, 897 So. 2d 202, 204 (¶11) (Miss. Ct. App. 2005)). Crucially, "[t]his principle applies, however, only where the non-custodial

33

parent proves by a preponderance of the evidence that he has, in fact, paid the support . . ."

*Id*. (quoting *Artz v. Norris*, 163 So. 3d 983, 989 (¶19) (Miss. Ct. App. 2015)).

¶68.    The chancellor's order states:

-    "Joshua's child support obligation to Haley terminated on November 1, 2022, when she moved into his home. Joshua is therefore entitled to credit against arrearages that accumulated after Haley moved in (for the months of November 2022 - present) *Varner v. Varner*, 588 So. 2d 428, 434-35 (Miss. 1991) and *Wallace v. Wallace*, 336 So. 3d 1151 (Miss. Ct. App. 2022). This credit shall amount to $5,000.00, which reflects ten months of child support based on Jennifer's AGI of $500.00. The $5,000.00 credit shall be deducted from the total Joshua owes in back pay ($21,834.00). Therefore, the total amount of back pay in child support Joshua will pay to Jennifer is $16,834.00."
-    "Consequently, this court cannot order a custodial parent to pay support to a noncustodial parent. *Rush v. Rush*, 932 So. 2d 794, 800 (Miss. 2006)."
-    ". . . but Mississippi law states nonetheless that child support is due until emancipation."
-    In a footnote: "Because Haley now lives with Joshua and the Court is not ordering child support from Jennifer after August 2023 . . . ."

¶69.    Credit against Joshua's arrears was based on the chancellor's calculation of Jennifer's adjusted gross income and what payments at 14% of her AGI would amount to for the 10-month period after Haley moved from Jennifer's home into Joshua's. This is not the proper standard for determining credit for child support payments.

¶70.    Joshua did not make any child support payments to Jennifer for the 10-month period from November 2022 through the entry of the court's order in August 2023. Because Haley was not emancipated, and since there is no evidence of payments made by Joshua, he was not allowed a credit against his child support arrears.

34

¶71. Furthermore, as *explicitly cited by the chancellor*: "[T]his court cannot order a custodial parent to pay support to a noncustodial parent. *Rush v. Rush*, 932 So. 2d 794, 800 [(¶16)] (Miss. 2006)." And "[s]ince the custodial parent has the obligation to see to the support, maintenance and education of the children[,] the non-custodial parent is not entitled to any monetary assistance from the custodial parent even during periods of visitation." *Masino v. Masino*, 829 So. 2d 1267, 1273 (¶26) (Miss. Ct. App. 2002) (quoting *Mosley v. Mosley*, 784 So. 2d 901, 905 (¶12) (Miss. 2001)).

¶72. Per the chancery court's temporary order entered in September 2020, "Jennifer has physical custody of the minor children," and "[a]ll provisions of all prior Orders of this Court not expressly altered by this Order shall remain in full force and effect, until further Order of this Court." Then, in the December 2022 order entered before trial had occurred, the chancery court held, "All provisions of all prior Orders of this Court not expressly altered by this Order shall remain in full force and effect, until further Order of this Court. This includes, among other things, all provisions related to the remaining minor child of the parties, who remains a minor until such time as she obtains the age of 21, is married, or filing of a specific Order of this Court emancipating her and altering the rights and responsibilities of the parties as to that minor child . . . ."

¶73. As such, at the time child support vested in November 2022, Jennifer was undoubtedly still the custodial parent of Haley per court order. So, it then follows that Jennifer could not be ordered to pay support to Joshua, the non-custodial parent.

35

¶74. Haley's moving in with Joshua did not automatically terminate his child support obligations since she was not 21 years old or emancipated. So, Joshua's support obligation did not in fact terminate on November 1, 2022. Under the terms of the PSA, Joshua's support obligations would not terminate until Haley's 21st birthday in October 2025, she met the criteria for emancipation, or the court found evidence of a material change in circumstances warranting modification of the original support order.

¶75. For illustration, in *Bryant v. Bryant*, 924 So. 2d 627, 630 (¶6) (Miss. Ct. App. 2006), "Beth, in her complaint, sought back child support for the nearly two years that Chad resided with Bobby." "This change in custody and child support was an extra-judicial agreement made between Beth and Bobby. The parties agreed that Bobby would be relieved of paying child support while Chad lived with him." *Id*. Our Court found "the mother was attempting to take advantage of an extra-judicial agreement that had been negotiated between the parties" in which "Beth had agreed that Bobby would take custody of Chad, support him, and be completely responsible for him." *Id*. at 630-31 (¶¶7, 9). It was ultimately held, "To allow Beth to be relieved of supporting Chad and also receive child support for him would allow Beth to 'have her cake and eat it too.'" *Id*. at 630 (¶7).[8]

¶76. Unlike *Bryant*, Jennifer and Joshua did not have an extra-judicial agreement for Haley

---

[8] *See also Varner v. Varner*, 588 So. 2d 428, 434-35 (Miss. 1991) ("When the custodial parent received full child support during the time she had custody of the child, did not complain when the child moved in with the other parent, and accepted this arrangement for 20 months with child support being paid directly to the child, the parent paying the support is entitled to full credit for all support paid to the child").

to move out of Jennifer's and in with Joshua. Jennifer actually protested Haley's move and fought against it. Without an order modifying custody, the chancery court could not grant Joshua an award of child support from Jennifer.

¶77. Ultimately, "[n]o party obligated by a judicial decree to provide support for minor children may resort to self-help and modify his or her obligation with impunity." *Manley*, 378 So. 3d at 398 (¶21) (quoting *Crow v. Crow*, 622 So. 2d 1226, 1231 (Miss. 1993)). Joshua could not resort to self-help and terminate his obligation with impunity.

### III. Reimbursement for Uninsured Healthcare Expenses

¶78. Lastly, the chancery court erred when it denied Jennifer's request for reimbursement of uninsured medical costs. The contractual provisions in the PSA required Joshua to pay one-half of all the children's uninsured medical costs (thereby obligating Jennifer only to paying one-half of these costs). Any amount the court found that he paid toward his insurance coverage obligations is separate and distinct and cannot overlap with his obligation related to uninsured medical expenses.

¶79. "[A] property settlement agreement is a contractual obligation." *Stewart v. Stewart*, 382 So. 3d 531, 537 (¶17) (Miss. Ct. App. 2024) (quoting *Harris v. Harris*, 988 So. 2d 376, 378 (¶8) (Miss. 2008)). "When a parent contracts to provide such support, the court will require that parent to honor that agreement." *Id.* at 538-39 (¶19). Furthermore, "If by reason of the supporting parent's default, the custodial parent is forced to dip into her own resources beyond what would otherwise be expected of her, she may recover and retain amounts so

37

proved." *Varner*, 588 So. 2d at 433.

¶80. The chancery court found:

- "Joshua, however, argued that his $300 monthly increase covered all medical costs, including premiums and unpaid medical expenses, and he had no obligation to pay any additional costs. Jennifer countered that the additional funds were for the insurance premiums, and that Joshua was still obligated to pay for medical costs and expenses per the PSA."
- "The PSA require Joshua to provide medical insurance for the children 'at his expense' and for each party to pay half of any non-covered medical and dental expenses."
- "The PSA did not contain provisions regarding notification for reimbursement of medical and dental costs paid in full by one party."
- "Jennifer's summary of health care expenditures is separated into two categories, one for Nicholas (from 2017 until his emancipation in July 2021), and the other for Haley (from 2019 until present). Jennifer calculated the total amount of Joshua's share of the expenses to be $4,848.36."
- "From 2017, less the two months he was given credit for above [June and July of 2020-but Jennifer did not include these months in her summary of expenditures], Joshua has paid the extra $300.00 for 36 months. This totals $10,800."
- "This amount creates a surplus of nearly $6,000 over and above Joshua's portion of the health care expenses during this period."
- "[I]t is also presumable that the approximate $6,000 surplus Joshua paid during this period was applied to insurance premiums during the same period, which would explain why Jennifer seeks reimbursement for only those premium payments incurred after the filling of this matter in June 2020. Therefore, Jennifer's claim for expense reimbursement is DENIED."

¶81. The parties' PSA here contained separate provisions for healthcare obligations. One required Joshua to be solely responsible for the expenses of providing insurance premiums for the children and for paying Nicolas's specific medical expenses. The other provision required Joshua and Jennifer "each pay one-half of the medical, dental, ocular, orthodontic

38

or other related expenses . . . not paid by said insurance . . . ."

¶82.     A review of the PSA shows the parties intentionally separated the costs of insurance from the costs of uninsured healthcare expenditures, and the PSA distinctly made the parties obligated to separate requirements.

¶83.     Joshua's default, and the chancery court's allowance of his default, required Jennifer to dip into her own resources beyond what was required of her under the PSA, in order to cover the children's medical expenses—so she is entitled to recover those costs separately from any obligation related to insurance premiums.

¶84.     Furthermore, in *Manley*, this Court found that the non-custodial parent's "argument seems to hinge on his assumption that anything provided by him to the children would have to be classified as child support and deducted from the monthly award." 378 So. 3d at 398 (¶20) (citation omitted). "But [it] is simply not the case under Mississippi law; we have routinely authorized separate awards of housing, transportation, medical care or insurance, college or private school expenses, and the like, as support in addition to monthly cash payments." *Id*. And "[a]s our Supreme Court has stated, he who unilaterally modifies a court order does so at his own peril." *Id*. at (¶21) (quoting *Carite v. Carite*, 841 So. 2d 1148, 1155 (¶16) (Miss. Ct. App. 2002)).

¶85.     Joshua's assumption that the "$300" voluntary payment by oral agreement would have been classified as covering all medical-related expenses was incorrect. So, the modification of monthly payments to include an additional $300 from Joshua—without a court order

modifying as such—was done at Joshua's own peril.

¶86.    Mixing together the insurance premium costs and all the uninsured medical expenses as one combined healthcare obligation was error. From there, the chancellor then also erred by applying the sum of all Joshua's previous $300 Venmo payments, which he labeled "insurance" on each transaction, as covering that combination of expenses such that the chancellor found he had paid a "surplus" in insurance premiums that covered outstanding uninsured medical costs. Without proof from Joshua showing by a preponderance of the evidence that he paid his 50% share of each of the uninsured medical expenses, it was error to relieve him of this obligation and deny Jennifer's requested reimbursement.

**Conclusion**

¶87.    Our job is not merely to rubber-stamp the decision of the chancellor. If that were so, then there would be no such thing as an appeal. As the majority correctly points out, our standard of review is deferential. But deference is not unlimited. This Court is charged with determining if the trial court crossed a line.  The purpose of the chancery court is to do equity. Such is vested in it by virtue of the Constitution of 1890. And it has long been established that "equity will not suffer a wrong without a remedy." *White v. White*, 325 So. 3d 666, 674 (¶33) (Miss. Ct. App. 2020). My core concern is that Jennifer was stranded without a remedy.

¶88.    The chancery court's decisions effectively reward Joshua's gamesmanship in proceedings that are supposed to be about supporting his children. In order to safeguard that

40

crucial mission and in the interest of justice, I believe we must reverse.

**LASSITTER ST. PÉ, J., JOINS THIS OPINION. WILSON, P.J., WESTBROOKS, McDONALD AND EMFINGER, JJ., JOIN THIS OPINION IN PART.**